**SOUTHLAND ROYALTY COMPANY**

v.

**The UNITED STATES.**

No. 12–75.

United States Court of Claims.

July 14, 1978.

R. Gordon Appleman, Fort Worth, Tex., attorney of record for plaintiff. Bird & Appleman, Fort Worth, Tex., of counsel.

Donald H. Olson, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and KUNZIG, Judges.

## OPINION

DAVIS, Judge.

This is a corporate income tax dispute whether certain business expenditures should be deducted as ordinary and necessary expenses or should be capitalized. Taxpayer Southland Royalty Company ("Southland") is engaged in the oil and gas business. It keeps its books and reports its income and expenses for federal income tax purposes on the calendar year and accrual bases. The controversy resolves around the deductibility of legal expenses which Southland accrued during 1966, 1967, and 1968 in connection with litigation, and of expenses which it accrued during 1968 for a study of petroleum reserves. Senior Trial Judge White concluded that the plaintiff was entitled to take a current deduction for (1) the litigation costs incurred in 1966 in connection with the collection of royalties; (2) unrelated legal expenses incurred in 1967 and 1968 in a separate suit concerning the timing of the reversion of a leasehold; and (3) the costs of preparing the oil reserve

survey incurred in 1968 as ordinary and necessary business expenses under I.R.C. § 162(a). In so deciding, the trial judge held that plaintiff was not required to capitalize the various costs pursuant to I.R.C. § 263, as contended by the defendant. We concur with this disposition of the first and third issues, but rule for the defendant on the second.[1]

## I.

Southland contends that each of the three items of expense involved in this suit was deductible for income tax purposes under I.R.C. § 162(a),[2] which provides that:

> (a) *In general.*—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business . . . .

I.R.C. § 263(a)(1), on the other hand, declares that:

> (a) *General Rule.*—No deduction shall be allowed for—
>
> (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate. . . .

 It is familiar law that I.R.C. § 263 (if applicable) takes precedence over I.R.C. § 162. I.R.C. §§ 161, 261.[3] *See Commissioner of Internal Revenue v. Idaho Power Co.*, 418 U.S. 1, 17, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974). Also, I.R.C. § 263 does not provide a complete list of nondeductible ex-

penditures.[4] *Commissioner of Internal Revenue v. Lincoln Savings & Loan Assn.*, 403 U.S. 345, 358, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971). Expenditures incurred in the acquisition of a capital asset must generally be capitalized. *Woodward v. Commissioner of Internal Revenue*, 397 U.S. 572, 575, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970). "Ordinary," as used in I.R.C. § 162, differentiates between those expenses currently deductible versus those which must be capitalized and amortized over the life of the asset, if they are deductible at all. *Commissioner of Internal Revenue v. Tellier*, 383 U.S. 687, 689–90, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966). An expense satisfies the requirement of being "necessary" within the statute if it is "appropriate and helpful" to "the development of the [taxpayer's] business." *Tellier, supra*, 383 U.S. at 689, 86 S.Ct. 1118; *Welch v. Helvering*, 290 U.S. 111, 113, 54 S.Ct. 8, 78 L.Ed. 212 (1933).

For each of the items in controversy, defendant argues on the basis of the regulations that the expenditure must be capitalized because it was incurred: (1) in defending or perfecting title to property (Treas. Reg. § 1.263(a)–2(c)); (2) in the acquisition of property having a useful life substantially beyond the end of the taxable year (Treas. Reg. § 1.263(a)–2(a)); and/or (3) in adding to the value of, or substantially prolonging the life of, property owned by the taxpayer (Treas.Reg. § 1.263(a)–1(a)(1)–1(b)).[5] We test the three claimed deductions by these general standards.

---

1. Neither party excepts to the trial judge's findings of fact which we adopt. The issues before us are essentially "legal" problems or "mixed" questions in which the "legal" element predominates.

2. All references to the Internal Revenue Code are to the provisions as they were in force during the applicable tax years.

3. I.R.C. § 161 provides:
 "In computing taxable income under section 63(a), there shall be allowed as deductions the items specified in this part, subject to the exceptions provided in part IX (sec. 261 and following, relating to items not deductible)."
 I.R.C. § 261 provides:

"In computing taxable income no deduction shall in any case be allowed in respect of the items specified in this part."

4. In *Georator Corp. v. United States*, 485 F.2d 283, 285 (4th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974), the court noted that an expenditure does not have to be described as a capital asset in I.R.C. § 1221 in order to be classified as a capital expenditure.

5. Treas. Reg. § 1.263(a)–1, T.D. 6313, 1958–2 C.B. 117, reads in pertinent part as follows:
 "§ 1.263(a)–1 CAPITAL EXPENDITURES; IN GENERAL.—(a) Except as otherwise provided in chapter 1 of the Internal Revenue Code of 1954, no deduction shall be allowed for—
 "(1) Any amount paid out for new buildings or for permanent improvements or betterments

## II.

### *The 1966 Litigation Expenses*

At the times pertinent to this litigation, Southland owned a fraction of the royalty interest in a certain 480-acre parcel of land located in Winkler County, Texas; two other companies, Avoca Corporation ("Avoca") and Socony Mobil Oil Company ("Mobil"), owned the remaining fractions of the royalty interest in the 480 acres; and Pan American Petroleum Corporation ("Pan Am") and Westbrook-Thompson Holding Corporation ("Westbrook") were the holders of a mineral lease on the land, authorizing them to mine and operate for oil, gas, potash, and other minerals.

The mineral lease referred to in the preceding paragraph contained three numbered royalty provisions, as follows:

(1) The first royalty provision required the lessee to deliver to the credit of the lessor (*i. e.*, to Southland, Avoca, and Mobil, as successors to the original lessor insofar as the royalty interest was concerned), free of cost, "the equal one-eighth part of all oil produced and saved from the leased premises and ⅛ of the net proceeds of potash and other minerals at the mine."

(2) The second royalty provision required the lessee to pay the lessor $100 per year "for the gas from each well where gas only is found, while the same is being used off the premises * * *."

(3) The third royalty provision required the lessee to pay the lessor $50 per year "for gas produced from any oil well and used off the premises * * *."

In 1956, Pan Am and Westbrook drilled a deep well on the 480-acre parcel, and this well produced only gas. They began selling gas from this well in 1958. Two other deep gas wells were completed on the 480-acre parcel, one in 1958 and one in early 1959; and Pan Am and Westbrook began selling gas from these wells. Sales of gas from the three deep wells were running at the rate of more than a million dollars per year in 1959, after the completion of the third well.

As of 1959, Pan Am and Westbrook were paying Southland and the other royalty owners, in connection with the production and sale of gas from the three deep wells referred to in the preceding paragraph, at the rate of $100 per well per year, under the second royalty provision previously mentioned.

In 1959, Southland, Avoca, and Mobil filed suit against Pan Am and Westbrook in a Texas district court, seeking additional royalty payments on the gas produced and sold from the three wells mentioned in the two immediately preceding paragraphs of this opinion. Southland et al. contended in the litigation that they had the right to have their payments calculated on the basis of one-eighth of the net proceeds from the sale of the gas, under the phrase in the first royalty provision of the mineral lease requiring the payment of "⅛ of the net proceeds of potash and *other minerals* at the mine" (emphasis supplied); and that the second and third royalty provisions relative to lump-sum payments per well per year in connection with gas were applicable only to gas used by Pan Am and Westbrook off the

---

made to increase the value of any property or estate . . . .

. . . . .

"(b) In general, the amounts referred to in paragraph (a) of this section include amounts paid or incurred (1) to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment, or (2) to adapt property to a new or different use. Amounts paid or incurred for incidental repairs and maintenance of property are not capital expenditures within the meaning of subparagraphs (1) and (2) of this paragraph. See section 162 and § 1.162–4."

Treas. Reg. § 1.263(a)–2 provides (in relevant part):

§ 1.263(a)–2 "EXAMPLES OF CAPITAL EXPENDITURES.—The following paragraphs include examples of capital expenditures:

"(a) The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year.

. . . . .

"(c) The cost of defending or perfecting title to property."

leased land.[6] On the other hand, Pan Am and Westbrook contended that the second and third royalty provisions, requiring the lessee to pay the lessor a flat sum per well per year relative to gas "while the same is being used off the premises," were applicable both to the use and to the sale of gas by the lessor; and that the first royalty provision was inapplicable to gas.

On motions for summary judgment by all parties (there being no dispute as to any material fact), the state district court sustained the position of Pan Am and Westbrook; and this judgment was later affirmed by the Texas Court of Civil Appeals.

The case was then taken to the Texas Supreme Court by Southland et al. The Texas Supreme Court first decided the case in favor of Pan Am and Westbrook on June 26, 1963. On motion for rehearing, however, the Texas Supreme Court on January 29, 1964, withdrew its prior opinions of June 26, 1963, substituted new opinions which construed the royalty provisions of the lease in favor of Southland et al., reversed the judgments of the district court and of the Texas Court of Civil Appeals, and remanded the cause to the district court for further proceedings in accordance with the new opinions. The Texas Supreme Court held (378 S.W.2d 50) that the first royalty provision was applicable to gas sold by Pan Am and Westbrook, and that the second and third royalty provisions were applicable only to gas used by Pan Am and Westbrook off the leased land. Further motions for rehearing were denied by the Texas Supreme Court.

The district court, on remand, entered a final judgment on June 29, 1964, determining the respective amounts due Southland et al. in accordance with the Texas Supreme Court's decision of January 29, 1964. Pan Am and Westbrook took an appeal; and on October 27, 1965, the Texas Court of Civil Appeals affirmed the district court's decision of June 29, 1964.

After Pan Am and Westbrook filed with the Texas Supreme Court an application for writ of error to review the Texas Court of Civil Appeals' decision of October 27, 1965, but before any action was taken by the Texas Supreme Court on the application, the parties entered into a settlement agreement which concluded the litigation. Under the settlement agreement, Southland on or about March 30, 1966, collected a lump sum of $168,990.78 representing royalties that had accrued to Southland's account through December 31, 1965, plus interest thereon in the amount of $26,247.81. In addition, the settlement provided for Southland to receive, from and after January 1, 1966, its proportionate share of royalty payments calculated on the basis of one-eighth of the net proceeds received by Pan Am and Westbrook from the sale of gas, as provided for in the first royalty provision of the lease dated March 27, 1925.

On May 16, 1966, Southland paid to the law firm of Jackson, Walker, Winstead, Cantwell and Miller the sum of $75,276.18, being a fee of $75,000 and related expenses of $276.18, for the law firm's services in connection with the litigation and settlement proceedings mentioned above.

In preparing its federal income tax return for 1966, Southland deducted the $75,276.18 referred to in the preceding paragraph. Upon examination of Southland's income tax return for 1966, the Internal Revenue Service disallowed the total amount of the deduction, determining that these litigation expenses should be capitalized. Following exhaustion of the administrative appeal, the IRS assessed against Southland additional income tax in the amount of $36,132.57, plus interest thereon in the amount of $7,934.81, or a total of $44,067.38. Southland paid the $44,067.38 to the Internal Revenue Service in three installments during the period between December 4, 1970, and March 5, 1971.

Subsequently, Southland filed with the Internal Revenue Service a timely claim for the refund of the $44,067.38, plus statutory interest. This claim was denied by the IRS on January 26, 1973.

---

**6.** The lease granted Pan Am and Westbrook "the right to use, free of cost, gas, oil and water produced on said land for all operations thereon * * *."

■ The principal question is whether this Pan Am-Westbrook litigation of Southland's must be regarded as the defense or perfection of taxpayer's title to property within Treas. Reg. 1.263(a)–2(c) (*supra*, note 5). Capitalization of expenditures incurred for the purpose of defending or quieting title is a rule of long standing, "virtually as old as the federal income tax itself." *Spangler v. Commissioner of Internal Revenue*, 323 F.2d 913, 919 (9th Cir. 1963). There is, however, no hard-and-fast demarcation between expenditures that must be capitalized under the rule and those that may be deducted currently. *Manufacturers Hanover Trust Co. v. United States*, 312 F.2d 785, 788–89, 160 Ct.Cl. 582, 589, *cert. denied*, 375 U.S. 880, 84 S.Ct. 150, 11 L.Ed.2d 111 (1963); *Morgan's Estate v. Commissioner of Internal Revenue*, 332 F.2d 144, 150 (5th Cir. 1964). The individual facts must almost always be weighed and taken into account. *Manufacturers Hanover Trust Co., ibid; see also Southern Natural Gas Co. v. United States*, 412 F.2d 1222, 1263, 188 Ct.Cl. 302, 370 (1969); *Connecticut Light & Power Co. v. United States*, 368 F.2d 233, 240, 177 Ct.Cl. 395, 407 (1966).

In the past, the main gauge for determining the character of legal fees has been to examine the "primary purpose" of the litigation; if the main objective was the defense or perfection of title, the expenditures had to be capitalized, but if title was only incidental to the litigation they could be deducted. *Manufacturers Hanover Trust Co., supra*, 312 F.2d at 789, 160 Ct.Cl. at 589; *Loyd v. United States*, 153 F.Supp. 416, 419, 139 Ct.Cl. 626, 632 (1957); *Industrial Aggregate Co. v. United States*, 284 F.2d 639, 645 (8th Cir. 1960). The Supreme Court observed in *Woodward v. Commissioner of Internal Revenue, supra*, 397 U.S. at 577, 90 S.Ct. at 1306 of the "primary purpose" test:

> That uncertain and difficult test may be the best that can be devised to determine the tax treatment of costs incurred in litigation that may affect a taxpayer's title to a property more or less indirectly, and that thus calls for judgment whether the taxpayer can fairly be said to be "defending or perfecting title." Such uncertainty is not called for in applying the regulation [Treas. Reg. § 1.263(a)–2(a)] that makes the "cost of acquisition" of a capital asset a capital expense. In our view application of the latter regulation to litigation expenses involves the simpler inquiry whether the origin of the claim litigated is in the process of acquisition itself.

Neither party contends that there would be any difference here if the "origin of the claim" test were to be used instead of the "primary purpose" standard; neither do we, on these facts, see that there would be any difference. Although some courts have held that "primary purpose" has been supplanted by "origin of the claim" in suits involving defense of title (*see Anchor Coupling Co. v. United States*, 427 F.2d 429, 432–33 (7th Cir. 1970), *cert. denied*, 401 U.S. 908, 91 S.Ct. 866, 27 L.Ed.2d 806 (1971); *Reed v. Commissioner*, 55 T.C. 32, 38–40 (1970)) we need not reach that point.

For this item, the crucial circumstances, under either standard, are, first, that Southland, on the one hand, and Pan Am-Westbrook, on the other, both agreed that the latter had the full right to take gas from the leasehold; second, that Pan Am-Westbrook conceded that Southland was entitled to be paid for the gas taken; and, third, that the only disputed issue was the amount Pan Am-Westbrook was to pay Southland for the gas (*i. e.*, under which provision of the lease were the gas royalties to be calculated). These facts demonstrate that defense or perfection of Southland's basic title to the gas was in no way involved in the litigation. No one contested that basic title, nor was there any disagreement that Pan Am-Westbrook had the right to acquire title to the gas from Southland by producing it; the controversy was entirely over the separate question of how much Pan Am-Westbrook should pay taxpayer for the gas transferred from the latter to the former. The whole dispute is therefore most appropriately characterized as one over the computation or calculation of the

payments to be made to Southland by Pan Am-Westbrook.[7]

This case is measurably stronger for the taxpayer on this item than *Pierce Estates, Inc. v. Commissioner*, 3 T.C. 875 (1944). That taxpayer had brought suit against the lessee of gas and oil rights, who, in addition to questioning the manner of computing any royalties due, urged that no payments were due the plaintiff—the wells had produced gas, but no oil; the assignment required payments to be paid out of "all oil and other minerals produced"; and gas was not a mineral. The trial court disposed of this contention by noting that "the word 'minerals' in Texas, included gas, as a matter of law." 3 T.C. at 892. The Tax Court found that the litigation expenditures had been made for the sole purpose of collecting income due under the assignments,[8] not for defending or perfecting title, and were therefore deductible; there was no question of establishing a title against an adverse claimant, but only whether any payments were due and of the manner in which the royalty computations should be made. 3 T.C. at 892.[9]

Defendant would attempt to distinguish *Pierce Estates, Inc., supra*, on the ground that that plaintiff had initially filed suit because of a dispute over the mode of computation for the royalties; only after the action was brought did the defendant lessee raise the issue of whether gas was a "mineral," which was summarily resolved by a court order. The Government then argues to us that the existence *vel non* of a royalty interest was not really involved in *Pierce Estates, Inc.*; the sole purpose of the litigation was to collect "income due" under the lease. This is scarcely a satisfactory basis of differentiation. In *Pierce Estates, Inc.* the dispute over the meaning of "mineral" in that lease might conceivably have been seen as an attack on the plaintiff's title and right to the gas (and its proceeds), but the Tax Court did not so view it. In this instance, there is not even such a colorable basis for finding a challenge to title; the lessees never argued that Southland was not entitled to any royalties for gas; their only position was that the $100 *per annum* payment under the second provision of the lease was all that was owed. As we have pointed out, there was no cloud on Southland's right to the gas or right to dispose of it—merely a dispute over how much it was to be paid for the gas. The three royalty provisions of the lease which were construed in the Pan Am-Westbrook litigation did not, as far as we can tell, carve out separate, independent property interests for the disputants; those provisions simply set forth differing measures of compensation, depending on the circumstances.[10]

7. In this court, defendant concedes that taxpayer is entitled to deduct the litigation-cost of collecting *back* royalties owed by Pan Am-Westbrook. Defendant puts this figure at $18,-819.05 (of $75,276.18 total litigation expenses)—the amount said by plaintiff's former counsel to be attributable to the proceedings after remand from the Texas Supreme Court's decision in favor of Southland.

8. Although the Tax Court did not expressly discuss the case in terms of income already accrued versus future income, the order of the trial court construing the royalty provisions of the assignment required "such payments to be out of all minerals that have been or may be produced from the land covered by the said leases . . . ." 3 T.C. at 885. It seems clear that the decision resulting from the litigation for which the expenses were incurred affected not only past but also future income.

9. *Pierce Estates, Inc.* can usefully be contrasted with *Reed v. Commissioner, supra*, 55 T.C. 32.

There, a partnership interest had been sold to the Robilio family by the estate of the late father of the taxpayer; the taxpayer brought suit against the Robilios and the executors of her father's estate, alleging a breach of fiduciary duty. She requested that a constructive trust be imposed on the partnership interest and that it be reconveyed to the estate along with an accounting for all profits from the purchase. The court (applying the origin-of-the-claim test) found that the accounting request was merely incidental to the request for title; the litigation expenses had to be capitalized, since the taxpayer's success in obtaining an accounting was "wholly dependent upon her procuring title." 55 T.C. at 41.

10. Defendant seems to say that the second and third royalty provisions should be disregarded because the payments under them were relatively so small ($100 per year and $50 per year per well), but we cannot obliterate lease provisions which the parties to the lease deliberately

*Boagni v. Commissioner,* 59 T.C. 708 (1973), the main precedent cited by the defendant, dealt with a different situation. That taxpayer's group had entered into a mineral lease, under which the taxpayer's group and the Susan-Alice group were to receive royalties equal to one-eighth of all production; an overriding royalty interest in lieu of a cash bonus was also assigned by the lessee to the taxpayer's group. Under the partition agreement bonuses, rentals, and other considerations (except royalties) for mineral rights arising from leases on lands of the taxpayer's group were payable solely to the taxpayer's group, but the Susan-Alice group were entitled to a 29% interest in regular royalties and also royalties in excess of one-eighth of production ("excess royalties"). The Susan-Alice group brought suit against the taxpayer's group seeking a declaratory judgment that they were entitled to a 29% share of the overriding royalties; they asserted that the overriding royalty fell within the meaning of the partition agreement's provision granting them an interest in "excess royalties." The oil company operating the lease also brought a concursus proceeding asking the court for directions on the disposition of the overriding royalties paid into the court by the company. The Tax Court held that the legal fees incurred by the taxpayer allocable to the concursus proceedings were deductible, because the fund paid into the court registry was not a capital asset, but income derived from a capital asset. The legal fees incurred by the taxpayer in the declaratory judgment suit were held to be nondeductible. The proceedings in the declaratory judgment suit were a test of the taxpayer's group's title to the overriding royalty interest, challenged by adverse claimants who asserted that they were entitled to a portion of those royalty interests.

In the Tax Court's view the ambiguous use of the terms "royalty" and "excess royalty" in the partition agreement constituted in effect a cloud on the right of the taxpayer's group to 29% of the overriding royalty interest. Here on the other hand, there were no such adverse third-party claimants to any royalty interest. The conflict was wholly between Southland and Pan Am-Westbrook as to how much the latter should pay for taking gas.

■ Defendant's secondary arguments— *i. e.* those additional to the defense-or-perfection-of-title point—must also be rejected. As we have pointed out, Southland acquired no new property interest as a result of the Pan Am-Westbrook litigation; its right to be paid for the gas under the lease was unquestioned. Of course, the fact that the suit resulted in benefits to the taxpayer beyond the close of the taxable year is not in itself dispositive. The "one-year" rule is a "mere guidepost." *Colorado Springs Nat'l Bank v. United States,* 505 F.2d 1185, 1192 (10th Cir. 1974). Many expenses are deductible, even though they have a prospective effect beyond the close of the taxable year. *Commissioner of Internal Revenue v. Lincoln Savings & Loan Assn.,* 403 U.S. 345, 354, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971); *Southern Natural Gas Co., supra,* 412 F.2d at 1263, 188 Ct.Cl. at 371. Because no property interest was at stake but only the amount of Southland's income, we cannot hold that the portion of litigation expenses allocable to future income (the defendant concedes that the portion of the legal expenses allocable to the collection of back-royalties and interest thereon is deductible, *see* note 7, *supra* ) was nondeductible even though the taxpayer's suit for an accounting necessarily had an effect on its future income.[11] *See, e. g.,*

---

inserted in good faith and over which they had a long and costly litigation. There is no suggestion that the lease was drawn up in that way for federal tax purposes or with federal tax consequences in mind. *See, also,* note 12, *infra.*

11. I.R.C. § 212, though not directly involved in this litigation, pertains to the defendant's contention that litigation expenses are not deducti-

ble to the extent they are allocable to the collection of future income; the predecessor of I.R.C. § 212 was added to allow taxpayers to treat expenses incurred in income-producing activities other than trade or business or in the conservation of property held for the production of income in the same manner as ordinary and necessary expenses incurred in trade or business under I.R.C. § 162. *See United States*

*Industrial Aggregate Co. v. United States, supra,* 284 F.2d at 647–48.

By the same token, we hold it inappropriate to characterize the Pan Am-Westbrook suit as adding to the value of taxpayer's leasehold (within Treas. Reg. § 1.263(a)–1(a)(1), –1(b) ). In a colloquial sense it may, of course, have had that effect; any suit to increase an owner's income (for example, a step-up in rental payments) could be comparable, but the capitalization provisions of the Code and the regulations were plainly not designed to eat up all expenditures incurred in the process of collecting income thought to be due from property.[12]

## III.

### *The 1967 and 1968 Litigation Expenses*

On July 14, 1925, W. N. Waddell and others, as the owners of 45,771 acres of land situated in Crane County, Texas, and commonly known as the "Waddell Ranch," granted an oil and gas lease on such land to Gulf Production Company, corporate predecessor of Gulf Oil Corporation ("Gulf"). As successor to W. N. Waddell and others, Southland later became the owner of a fraction of the royalty interest in the Waddell Ranch and, therefore, of a fractional reversionary interest entitling Southland to participate in the further development of the minerals, or in the issuance of a new mineral lease on the property, following the expiration of the term of Gulf's oil and gas lease on the property.

The Gulf lease was for a term of 12 years from its date and for as long thereafter as oil or gas was produced from the land, but the term of the lease was limited by a provision expressly declaring "that this lease shall not remain in force longer than fifty (50) years from this date."

Gulf successfully drilled many oil and gas wells on the Waddell Ranch; and, by 1967, Gulf was operating on that property approximately 900 wells that were producing oil and gas. Southland was entitled to (and presumably received) its proportionate share of the royalty payments on the oil and gas produced by such wells.

*v. Gilmore,* 372 U.S. 39, 44–45, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963); *Trust of Bingham v. Commissioner of Internal Revenue,* 325 U.S. 365, 373–74, 65 S.Ct. 1232, 89 L.Ed. 1670 (1945); *Spangler, supra,* 323 F.2d at 918. Treas. Reg. § 1.212–1(b), T.D. 6279, 1957–2 C.B. 192, promulgated under I.R.C. § 212, is of interest:

> The term "income" for the purpose of section 212 includes not merely income of the taxable year but also income which the taxpayer has realized in a prior taxable year or may realize in subsequent taxable years; and is not confined to recurring income but applies as well to gains from the disposition of property. For example, if defaulted bonds, the interest from which if received would be includible in income, are purchased with the expectation of realizing capital gain on their resale, even though no current yield thereon is anticipated, ordinary and necessary expenses thereafter paid or incurred in connection with such bonds are deductible. Similarly, ordinary and necessary expenses paid or incurred in the management, conservation, or maintenance of a building devoted to rental purposes are deductible notwithstanding that there is actually no income therefrom in the taxable year, and regardless of the manner in which or the purpose for which the property in question was acquired. Expenses paid or incurred in managing, conserving, or maintaining property held for in-

> vestment may be deductible under section 212 even though the property is not currently productive and there is no likelihood that the property will be sold at a profit or will otherwise be productive of income and even though the property is held merely to minimize a loss with respect thereto.

I.R.C. §§ 162 and 212 are to be read *in pari materia. Woodward, supra,* 397 U.S. at 575 n.3, 90 S.Ct. 1302, I.R.C. § 263 supersedes I.R.C. § 212 just as it does § 162. *See* I.R.C. §§ 211, 261.

12. Here, too, defendant appears to emphasize the disparity in income available to Southland under the first royalty provision of the lease as compared to that recoverable under the second and third provisions. *See* note 10, *supra.* But for the reasons already suggested we do not believe this case should be decided any differently than if the second and third provisions had required payments of $10,000 and $5,000 per well per annum. Bad faith and tax-oriented arrangements aside, it would unduly complicate and strain the enforcement of the capitalization provisions to make the result turn, solely or primarily, on the varying contrasts between the monetary benefits flowing to the owner if he won or lost the underlying substantive litigation.

The Texas Railroad Commission, in the exercise of authority conferred on it by the Texas legislature, ordered production of oil and gas from the wells on the Waddell Ranch to be stopped for 197 days between January 20, 1938, and March 23, 1940. Thereafter the Commission issued monthly proration orders which restricted the amount of oil and gas that could be produced by Gulf from the wells on the Waddell Ranch.

On or about October 11, 1967, Gulf and others filed suit against Southland and others in a district court of the State of Texas, seeking a declaratory judgment to determine the longevity of the oil and gas lease on the Waddell Ranch. Gulf et al. contended in the litigation that delays in the production of oil and gas from the Waddell Ranch due to proration orders issued by the Texas Railroad Commission should not be counted in determining the date on which the 50-year term of the lease would expire; and that the termination of the lease should not occur until 1987. Southland et al., on the other hand, contended that Gulf's leasehold estate would expire on July 14, 1975, which would be exactly 50 years after the date of the execution of the lease.

The litigation proceeded through the state district court and the Texas Court of Civil Appeals, each of which rendered judgment in favor of Southland et al.; and it was finally concluded by the Texas Supreme Court in a decision dated May 30, 1973 (496 S.W.2d 547). The Texas Supreme Court affirmed the judgments of the courts below, and declared that Gulf's oil and gas

lease on the Waddell Ranch would terminate finally on July 14, 1975.

During 1967 and 1968, Southland accrued obligations in the amounts of $22,898.68 and $113,892.55, respectively, representing amounts payable to one law firm in 1967 and to two law firms in 1968 for legal services rendered in connection with the litigation instituted by Gulf et al. These respective amounts were deducted by Southland in computing its federal income taxes for the calendar years 1967 and 1968; the deductions were disallowed by the Internal Revenue Service, which assessed deficiencies; the amounts of the deficiencies, plus interest, were paid by Southland; and Southland now sues for refunds.

The plaintiff urges, and the trial judge held, that the Gulf litigation did not relate to defense of title, but simply to the "timing" of Southland's receipt of income from the Waddell property.[13] We cannot accept this analysis. To us, the dominant factor is that there was a serious contest between taxpayer and Gulf over the right to the property for the period of some 12 years after 1975. Gulf was asserting the right to have and control the leasehold for almost 12 additional years and to exploit the mineral estate during that time-span under the provisions of the lease. At the termination of the leasehold, Southland would be free to sell the unencumbered property outright, exploit it in its own right, or enter into a new lease on different, possibly more favorable, terms. There was, however, a substantial cloud on Southland's right to do this in 1975;[14] section 7' of the Waddell

---

13. Southland characterizes its purpose in defending the Gulf suit as "to permit it to make definitive plans for the operation of the Waddell property upon a confirmation of the July 14, 1975, expiration date and to collect the ordinary income to accrue to its reversionary interest."

14. A number of courts have held that any litigation expenses must be capitalized, if they are incurred in the defense or perfection of title, regardless of the substantiality of the adverse claim. *Galewitz v. Commissioner of Internal Revenue,* 411 F.2d 1374 (2d Cir.), *cert. denied,* 396 U.S. 906, 90 S.Ct. 221, 24 L.Ed.2d 182 (1969); *Estate of Baier v. Commissioner,* 533

F.2d 117 (3d Cir. 1976); *Safety Tube Corp. v. Commissioner of Internal Revenue,* 168 F.2d 787 (6th Cir. 1948); *Schwabacher v. Commissioner of Internal Revenue,* 132 F.2d 516 (9th Cir. 1942). *But see* the comments of Judge Forrester, dissenting in *Ruoff v. Commissioner,* 30 T.C. 204, 226–27 (1958), *rev'd,* 277 F.2d 222 (3d Cir. 1960), he took the view that litigation costs should be capitalized only if the title was clouded at the time of acquisition, and the comments of Judge Wisdom, dissenting in *Usry v. Price,* 325 F.2d 657, 660–63 (5th Cir. 1963), against the holding that litigation costs were deductible in a suit that was a "re-hash" of issues in earlier title case; *Zietz v. Commissioner,* 34 T.C. 369, 382 (1960) (deduction al-

lease provided that "When drilling or other operations are delayed or interrupted by . . . or as the result of some order, requisition or necessity of the Government, . . . the time of such delay or interruption shall not be counted against the Lessee . . . ." Southland's "plans for the operation of" and collection of "ordinary income" from the property wholly depended upon whether it could gain complete control over its property interests upon the normal expiration date (1975); to do this it had to demonstrate its legal entitlement under the lease agreement for the period after 1975.[15] Gulf's declaratory judgment action was brought in 1967, some eight years before 1975—no present right to receive or duty to pay royalties was at all involved—and had as its sole object a determination that Gulf could continue as lessee for a long period after 1975. Southland necessarily took the opposite stance.[16] (The litigation was concluded in 1973, two years before the normal expiration date in 1975).

As might be expected, there is no precedent precisely in point, but there are decisions strongly suggesting the capitalization result, and none which (in our view) compels a conclusion favorable to plaintiff. In *Reed v. Commissioner, supra,* 55 T.C. 32, the taxpayer, in a prior suit, had attempted to have declared invalid an agreement which gave the defendants the opportunity to purchase a partnership interest owned by the

taxpayer, for the book value of the underlying tangible assets plus ten percent, before the interest could be transferred to anybody else. The Tax Court noted that the right to dispose of property freely was an important attribute of ownership; moreover, the right to income was not then in issue. Since the origin of the suit was directly related to the capital asset underlying the partnership agreement and the income interest was not affected by the attempt to remove the restriction upon the sale of the interest, the litigation expenditures were held to be capital in nature. The Tax Court found (under the origin-of-the-claim test) that the expenses were incurred in perfecting title to property. 55 T.C. at 41. *Cf. Thalhimer Brothers v. Commissioner,* 27 T.C. 733, 739 (1957) (capitalization required of payment made to seller so that land could be acquired at an earlier date than stipulated in sale contract; "possession of property is one of the principle attributes of ownership; and the right to early or immediate possession may affect materially the use, the desirability, and the market value"); *Third National Bank in Nashville v. United States,* 454 F.2d 689 (6th Cir. 1972); *American Spring & Wire Specialty Co. v. Commissioner,* 20 T.C.M. (CCH) 116 (1961) (costs of acquiring leaseholds so that old buildings could be demolished and new ones erected on land subject to leaseholds required to be capitalized). Here, as in those decisions, the

lowed for litigation costs incurred in suit "wholly without merit and malicious," since the petitions, which might have raised the title issue if allowed to stand, were dismissed). In this instance the issue in the reversionary interest litigation was substantial, so we need not reach the question of whether litigation costs arising from a frivolous claim need be capitalized.

15. In *Farmer v. Commissioner of Internal Revenue,* 126 F.2d 542, 544 (10th Cir. 1942), the court, in holding that the litigation expenses were incurred to defend title and therefore nondeductible, commented:

Petitioners did more than litigate the right to receive oil royalty payments. The title to the oil and gas lease under which they received these payments depended upon the title to the land. Without title to the land they had nothing. It was therefore necessary for them to defend and establish the title to the land in

order to retain their interest in the oil and gas.

16. The taxpayer in its 1967 annual report characterized the litigation as involving the question whether it would continue to have a royalty interest in the subject property or whether its interest would be converted in 1975 to a "mineral fee", and promised a "vigorous defense." Parenthetically, we do not regard as decisive that the plaintiff would acquire a "mineral fee" at the expiration of the leasehold. Disputes over much less substantial property rights have been held to fall within the purview of the regulations relating to the defense or perfection of title. *Reed, supra,* 55 T.C. 32 (right of first refusal on sale of partnership interest); *Boagni, supra,* 59 T.C. 708 (interest in overriding royalties); *Manufacturers Hanover Trust Co., supra,* 312 F.2d 785, 160 Ct.Cl. 582 (trustee's legal title).

"tree," not the "fruit" was directly at stake, and the "gist of the controversy [was] the right to the asset which produced the income." *Safety Tube Corp. v. Commissioner of Internal Revenue, supra,* 168 F.2d at 790.

Taxpayer, in riposte, stresses three sorts of rulings, none of which seems to us applicable. The first group relates to trust litigation. In *Herman A. Moore Trust v. Commissioner,* 49 T.C. 430 (1968), acq. 1968–2 Cum.Bull. 2, a trust sought a deduction under I.R.C. § 212(2) and Treas. Reg. § 1.212–1(i), allowing a deduction for "expenses of litigation, which are ordinary and necessary in connection with the performance of the duties of administration . . ." Two of the beneficiaries of the trust had brought suit for the activation of certain trusts in their favor; they argued that under the doctrine of acceleration of estates in remainder the renunciation of interest in some of the assets in the trust by their mother, the life income beneficiary, accelerated their interests. The Tax Court held that the trustee's primary purpose in litigating that suit was not in defending his title to the assets, but to obtain a decision on the timing of the remaindermen's rights as an aid to his administration of the trust.[17] 49 T.C. at 438. The litigation expenses were held deductible; the court's clarification of the time of activation of the remaindermen's interests allowed the trustee to administer the trust properly. That situation differs greatly from the one now before us. The distribution of income and corpus from a trust is an integral part of the management and administration of the trust. *See Bingham v. Commissioner of Internal Revenue, supra,* 325 U.S. at 374–75, 65 S.Ct. 1232; *Manufacturers Hanover Trust Co., supra,* 312 F.2d at 790, 160 Ct.Cl. at 592. For that reason expenses incurred

by a trust, in litigation over questions involving the timing of distributions of income and corpus, are from the trust's perspective expenses incurred in its administration and therefore deductible under I.R.C. § 212. The acquisition of complete possession and control over a mineral fee, through reversion at the end of a leasehold, is scarcely to be equated to the normal administration problems of a trust, which by their nature and purpose must be concerned with the timing of distributions of income and corpus.

Plaintiff also invokes *Bliss v. Commissioner of Internal Revenue,* 57 F.2d 984 (5th Cir. 1932), an early opinion which contains some broad language on the deductibility of expenses incurred to protect the owner's right to undisturbed possession and enjoyment of his property. We read later decisions of the Fifth Circuit as limiting the *Bliss* dictum, at most, to the costs of ejecting a present trespasser or illegal occupant (*see Jones' Estate v. Commissioner of Internal Revenue,* 127 F.2d 231, 232 (5th Cir. 1942); *Morgan's Estate v. Commissioner of Internal Revenue,* 332 F.2d 144, 150 (5th Cir. 1964)), and as inapplicable to a suit like Gulf's restricted to a declaration of future rights to property.[18]

Another type of case put forward by taxpayer is exemplified by *Industrial Aggregate Co. v. United States, supra,* 284 F.2d 639. Those are cases in which the prior litigation had mixed objectives—recovery of income or damages currently owed, plus some general defense of title—and in which the court passing on the tax question determined that the recovery of damages or income currently owed was the primary or dominant aim. In *Industrial Aggregate Company, supra,* 284 F.2d at 647–49, the

17. In *Manufacturer's Hanover Trust Co., supra,* 312 F.2d at 789–90, 160 Ct.Cl. at 591–92, we held that the litigation expenses had to be capitalized when the trustee's title to the. assets itself was challenged; the court noted that:

This situation is to be distinguished from that which would arise if a fiduciary sought to deduct expenses incurred in determining which of several potential beneficiaries was entitled to receive trust property. There the

fiduciary's title would not be at issue, and it would not be engaged in perfecting or defending title.

18. *Campbell v. Fields,* 229 F.2d 197 (5th Cir. 1956) and *Southern Natural Gas Co. v. United States,* 412 F.2d 1222, 188 Ct.Cl. 302 (1969), both involved the wholly non-title issues arising from unitization requirements leading to the more efficient recovery of oil and gas.

court (per then Circuit Judge Blackmun) concluded, on the basis of that particular record, that the primary purpose of the institution of the original state court litigation, of the taxpayer's defense of it, and of both parties in effecting a settlement, was the resolution of that taxpayer-lessee's alleged violations of the operating covenants of the leases (leading to damages for wrongs already committed and to immediate termination of the leases for breach), and that the taxpayer's consequent right or lack of right to an extension of its leases (which could occur only if it were operating properly) was secondary. In the present case, on the contrary, the Gulf litigation had no issues involving the disposition or amount of current income or any questions of damages then arising by Gulf under its lease or of damages owed by plaintiff to Gulf. The whole case revolved around the future title to and use of the leased property after 1975; the court fight (lasting from 1967 to 1973) centered on that problem of which company would have "title" to the property (i. e. right to control, use, and exploit) during the substantial period from 1975 to 1987.[19]

As a last resort, taxpayer attacks the validity of the regulation on defense or perfection of title to property, but we consider this regulation so long and so well entrenched that it has become part of income tax law. *See Industrial Aggregate Co. v. United States, supra,* 284 F.2d at 644, note 7, and Parts I and II of this opinion, *supra.*

IV

*The 1968 Oil and Gas Reserves Study Expenses*

■ In September 1967, Southland engaged Clarke B. Gillespie, a petroleum engineer and consultant, to analyze and estimate the extent of the oil and gas reserves

in the Waddell Ranch (the same ranch that was involved in the Part III of this opinion). Mr. Gillespie performed the necessary work involved in a reserve study, and submitted his report to Southland. Mr. Gillespie's fee and related expenses for his services in performing the reserve study amounted to $31,297.27. Southland accrued this obligation in 1968.

This $31,297.27 was deducted by Southland in computing its federal income tax for the calendar year 1968; the deduction was disallowed by the Internal Revenue Service, which assessed a deficiency against Southland; the amount of the deficiency, plus interest, was paid; and Southland seeks a refund in the present litigation.

The evidence in the record shows that oil and gas companies, such as Southland, from time to time hire independent petroleum engineers to analyze and estimate the extent of their oil and gas reserves, and that the management of a company uses the information obtained in reserve studies to make income projections, develop short-term and long-term budgets, arrange financing, and make reports to shareholders and regulatory authorities.

The prior decisions on the tax treatment of the costs of producing surveys said to be comparable to the Gillespie report all seem to have gone off on the postulate of considering the survey as part of some underlying property. *See Southern Natural Gas Co. v. United States, supra,* 412 F.2d 1222, 188 Ct.Cl. 302 (1969); *American Smelting & Refining Co. v. United States,* 423 F.2d 277, 288, 191 Ct.Cl. 307, 325 (1970); *Louisiana Land & Exploration Co. v. Commissioner,* 7 T.C. 507 (1946), *aff'd on other issues,* 161 F.2d 842 (5th Cir. 1947); *cf. Godfrey v. Commissioner of Internal Revenue,* 335 F.2d 82, 85 (6th Cir. 1964), *cert. denied,* 379 U.S. 966, 85 S.Ct. 660, 13 L.Ed.2d 560 (1965). In this instance, however, the Government disavows that approach and asks us to treat

---

**19.** In *Cruttenden v. Commissioner,* 70 T.C. No. 18 (May 8, 1978)—cited by plaintiff as a decision in which legal fees paid to facilitate the return of property (securities) were held deductible—there was no hint of a challenge to any title or legal interests of those taxpayers

(the Cruttendens) but merely a failure, for economic and financial reasons, to return the property on time. Moreover, the Cruttendens sought recovery of property to which they claimed an immediate, present right of possession—not a future right.

the Gillespie report, by itself, as property having a useful life in taxpayer's business lasting beyond the taxable year (1968).

Our difficulty with that line-of-reasoning is that the Gillespie report, if "property," is not the kind of property which should be capitalized by itself, even if its usefulness happens to last beyond the year in which it is produced. Gillespie's study was scarcely the sort of "separate and distinct asset" that the Court in *Lincoln Savings & Loan Assn., supra,* 403 U.S. at 354, 91 S.Ct. 1893, found "important and controlling." The taxpayer there claimed as an ordinary and necessary business expense additional premiums required by law to be paid to the Federal Savings and Loan Insurance Corporation for a "Secondary Reserve." The Court noted that the taxpayer's "distinct and recognized property interest in the Secondary Reserve" (403 U.S. at 355, 91 S.Ct. at 1899, was transferable under mergers and consolidations, refundable upon liquidation of the institution, could be used to pay the basic premium required of the taxpayer under certain circumstances, and was an income-producing entity, the income from which inured to the benefit of the taxpayer. The premium payments were not deductible under I.R.C. § 162. But the Court noted that "the presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year." 403 U.S. at 354, 91 S.Ct. at 1899.

Decisive for the deductibility of the expenses incurred for the Gillespie report is that they are functionally part of, and indistinguishable from, expenditures for ordinary management planning. As the trial judge pointed out, the reserve study is similar to a balance sheet in a corporation; its estimates, subject to change at any time from ongoing developments, assist management in making income projections, short-term and long-term budgets, the arrangement of financing, and the preparation of reports to shareholders and regulatory authorities. Had Gillespie been an employee of the company rather than a consultant, when he prepared the study, there would have been no question as to the deductibility of his salary. To follow the defendant's logic, much of the salaries and overhead incurred in the production and even use of all sorts of management studies should be capitalized; the time-period over which benefits would flow from such activities would presumably be longer than one taxable year. Obviously that is not the law as of now. It makes no difference, either, that the Gillespie report was held "confidential"; that could be true of many management plans reduced to written form.[20]

In another context we noted that the predecessor regulations requiring capitalization of expenditures for increasing the capital value of property or for defending title were intended to apply to tangible or intangible property with a basis; we pointed out that:

> [E]xpenditures made in connection with the defense or perfection of title to both tangible and intangible property (such as real estate, securities, chattels, etc.) can be taken into account in determining gain or loss, at the time the property is disposed of, by the simple course of adjusting the basis, or "tax cost," of the property. By denying an immediate deduction for expenditures of a capital nature, but instead allowing an addition to the basis of the property, the tax benefit (from a

---

20. It is worth noting that the geophysical survey involved in *Louisiana Land & Exploration Co., supra,* was quite different from the reserves study made by Gillespie for management planning purposes. The *Louisiana Land* geophysical survey, compiling data on underground structures, was performed prior to the acquisition of leases on the property surveyed in order to determine whether oil drilling was economically feasible. The Tax Court characterized the survey as "information upon which

would be based further tests and potential drilling operations during the entire period of petitioner's exploitation of the land for gas and oil." It was the "first step in the over-all development for oil of these tracts of land." 7 T.C. at 515–16.

In contrast, the Gillespie report was not produced for the purpose of utilizing (or planning the utilizing of) particular oil-and-gas properties over their useful lifetime.

decreased gain or an increased loss, as the case may be) is deferred until disposition of the property . . . .
*California & Hawaiian Sugar Refining Corp. v. United States*, 311 F.2d 235, 242, 159 Ct.Cl. 561, 573 (1962). By that means the accounting goal of matching expenditures to the income resulting from a capital transaction is achieved. Here the Government does not argue that there is some underlying tangible or intangible asset to which the survey costs may properly be added. *See also* note 20, *supra.* Neither is amortization appropriate. The useful life of the survey is very uncertain; as the trial judge found, the estimates in a reserve study are subject to change at any time and have to be updated every few years to take account of subsequent developments. In those circumstances, it is not compulsory to amortize such a recurring item over a fixed time-interval. Neither is it appropriate to require capitalization without amortization; such a requirement would clearly distort Southland's income.[21] As we have already observed, *supra*, the fact that expenditures provide benefits more than one year into the future is merely a factor for consideration and "does not mean that, by a Pavlovian reflex, they must always be non-deductible . . . ." *California & Hawaiian Sugar Refining Corp., supra*, 311 F.2d at 243, 159 Ct.Cl. at 574–75. We hold, in sum, that the reserve study costs are ordinary and necessary business expenses under I.R.C. § 162.

The result on the whole case is that plaintiff-taxpayer is entitled to recover with respect to the items discussed in Parts II and IV of this opinion, and not entitled to recover with respect to the item treated in Part III. The case is remanded to the Trial Division for a determination of the plaintiff's recovery pursuant to Rule 131(c).

COWEN, Senior Judge, concurring in part and dissenting in part:

I concur fully in Part II and Part IV of the court's opinion but I respectfully dissent from the holding in Part III, which involves the 1967 and 1968 litigation expenses incurred by Southland in the suit filed by the Gulf Oil Company. I would adopt the opinion of the trial judge, for in my opinion, he correctly held that:

Southland's ownership of a fraction of the royalty interest in the Waddell Ranch —and, therefore, of a fractional reversionary interest entitling Southland to participate in the further development of the minerals, or in the issuance of a new mineral lease on the property, following the expiration of the mineral lease on the ranch—had been acquired long before the controversy with Gulf arose over the longevity of the mineral lease. In the litigation, Gulf did not attack Southland's entitlement to a fractional royalty interest and related fractional reversionary interest. For that reason, there was no occasion in the litigation for Southland's title to an interest in the property either to be defended or perfected.

The question for decision cannot be answered by a general discussion of the elements of a capital expenditure. The defendant has promulgated regulations which were expressly intended to cover the situation involved in this case, and our task is to decide whether plaintiff's right to the deductions is precluded by Treas.Reg. 1.263(a)–2(a), which provides that the cost of acquisition of property having a useful life substantially beyond the taxable year is a capital expenditure, and Treas.Regs. 1.212–1(k) and 1.263(a)–2(c), which state that expenses incurred in defending or perfecting title to property are capital expenditures.

---

**21.** In *Colorado Springs National Bank, supra,* 505 F.2d at 1192, the court stated:

"The start-up expenditures [for a bank credit card system] here challenged did not create a property interest. They produced nothing corporeal or salable. They are recurring. At the most they introduced a more efficient method of conducting an old business. The govern-
ment suggests no way in which they could be amortized. The government's theoretical approach ignores the practicalities of the situation, and permits a distortion of taxpayer's financial situation. If an expenditure, concededly of temporal value, may be neither expensed nor amortized, the adoption of technological advances is discouraged."

Admittedly, "the line of demarcation between 'an ordinary and necessary expense' as a deductible item and an expenditure incurred in defense of title to property and therefore not deductible is extremely narrow."[1] I agree with the majority that there is no precedent precisely in point, but I differ with the court in its conclusion that the decisions cited by it strongly suggest the capitalization result. On the contrary, as I read them, all of the cases cited by the majority in support of its view directly and specifically involve costs incurred in acquiring property or in defending or perfecting title thereto. *Farmer v. Commissioner of Internal Revenue*, 126 F.2d 542, 544 (10th Cir. 1942), is a classic example of a situation in which the claimed expenses were incurred to defend and establish title to land. This is made plain by the following statement from the court's decision:

* * * The plaintiffs in each suit attacked the lessor's *title* to the land and claimed an interest in the oil and gas that petitioners were receiving under their assignment of the lessor's interest. The suits were defended and the claims of the plaintiff were held to be groundless, and petitioners' *title was established.* Petitioners' total cost of resisting this litigation was $10,804. They sought to deduct this amount as an ordinary business expense and have appealed from a decision disallowing the claim. [Emphasis supplied.]

The following quotation from *Reed v. Commissioner*, 55 T.C. 32, 40 (1970) demonstrates that this was a clear case of expenses incurred in the acquisition of title to property:

In our view the Supreme Court's holding in *Woodward* [*v. Commissioner of Internal Revenue*, 397 U.S. 572, 575, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970)], requires us to apply the origin-of-the-claim test to the expenses arising out of the first cause of action in *Reed v. Robilio* [248 F.Supp. 602 (W.D.Tenn.1965)]. This, in turn, requires a decision for the respondent. In that first cause of action the petitioners were attempting to obtain *title* to the 30.66-percent interest in R & C. The complaint filed on behalf of Martha [Reed] with the District Court sought an order of reconveyance. It is manifest that this would require a *conveyance of title* to the interest. Not only was "the origin of the claim litigated * * * in the process of acquisition itself," but the litigation was a direct attempt to *acquire.* *Woodward v. Commissioner of Internal Revenue, supra,* 397 U.S. at 577, 90 S.Ct. 1302. [Emphasis supplied.]

*Thalhimer Brothers, Inc. v. Commissioner*, 27 T.C. 733, 739 (1957), is a case involving the purchase price of a capital asset. It is another title acquisition case and was specifically so labeled by the Tax Court in its statement:

The second issue is whether petitioner is entitled to deduct, as a business expense, the amount of $25,000 which it *paid* to the sellers of real estate, *in order to obtain title* and possession at an earlier date than had been provided in the purchase contract. [Emphasis supplied.]

In *Third National Bank in Nashville v. United States*, 454 F.2d 689 (6th Cir. 1972), the taxpayer, after unsuccessful negotiations for an outright purchase of property in Nashville, entered into a 25-year lease agreement granting it an option to purchase the property, plus the right to demolish existing buildings and to construct new buildings on the site. When the lease agreement was executed, there were three existing leases on the property. The taxpayer expended funds to procure the early termination of the three leases and then erected a new building on the site. The only issue before the court in that case was whether the taxpayer's expenditures were allocable to the new building or to the land as a part of the basis. The court held that the costs paid for terminating the leases were allocable to the new building. Obviously, this is just another case where the taxpayer claimed deductions for amounts expended to acquire or perfect title to property.

1. *Rassenfoss v. Commissioner of Internal Revenue*, 158 F.2d 764, 766 (7th Cir. 1946).

*American Spring Wire Specialty Co. v. Commissioner,* 20 T.C.M. 116 (1961), primarily involved the acquisition of title to the property which the taxpayer had not previously owned. There the taxpayer attempted to purchase certain improved property adjoining its plant. The owner refused to sell but did agree to exchange it for other property. The taxpayer purchased the other property for $60,000 and exchanged it with the owner of the improved property it wished to acquire.

In contrast to the foregoing cases, in all of which the primary issue was the acquisition or defense of title to property, there are a number of decisions in which the facts are more similar to those in the case at bar. I view them as controlling the issue in favor of the taxpayer.

In *Bliss v. Commissioner of Internal Revenue,* 57 F.2d 984 (5th Cir. 1932), the taxpayer prevailed in a case in which the facts were not nearly as favorable to it as the facts supporting Southland's claim. There the taxpayer had acquired land in Louisiana on which adverse claims were asserted to oil and gas rights by one who had entered on some of the lands and proceeded to drill oil wells thereon. The taxpayer entered into agreements with two oil companies, which agreed to pay the taxpayer cash, plus other consideration, for oil and gas leases "when the lessor's title to the entire tract of land and to the oil, gas and other minerals thereunder had been perfected and the adverse claims of all parties thereto cancelled and removed." Lawyers were employed by the taxpayer to bring ejectment actions against the adverse claimant of the oil and gas mineral rights. The Supreme Court of Louisiana determined that the adverse claims were invalid. In holding that the attorney's fees expended by the taxpayer in the ejectment suits were deductible as ordinary and necessary expenses, the Fifth Circuit declared:

* * * The defendants in those suits set up claims, not to title to lands admitted to be owned by the firm, but to rights to minerals therein or extracted therefrom. What was adversely claimed was part of what was or might be produced from the lands when used in business by the firm or its lessees. To treat as an addition to the cost of land the amount of an expenditure made, after ownership was acquired, to enable the owner, his agent or lessee, to possess and use the land for business purposes, undisturbed by intruders or trespassers, would involve a disregard of the difference between the cost of acquiring ownership of property and expenses paid or incurred to protect the owner's right to undisturbed possession and enjoyment of his property, and what it yields or produces, by himself, his agents or lessees. It seems reasonable to treat amounts expended for services rendered in ejecting or excluding trespassers after ownership has been acquired as expenses incident to the ownership of property and the acquisition and enjoyment of income from it, rather than as additions to the capital investment in the property. * * * *2* [57 F.2d at 985.]

In *Tucker v. Commissioner,* 9 T.C.M. 956 (1950), a closely analogous case, the Tax Court reached the same result as in *Bliss.* The taxpayer successfully prosecuted an ejectment suit against a lessee and obtained possession of a leased farm. The court held that the attorney's fee paid for the prosecution of the suit was deductible from taxpayer's income.

The case of *Herman A. Moore Trust v. Commissioner,* 49 T.C. 430 (1968), involved facts which are more similar to those before us than the facts in any of the decisions relied on by the majority. The *Moore* case is particularly pertinent because of the Government's contention that Southland's title to its reversionary interest in the lease-

2. Although the majority asserts that the holding in the *Bliss* case has been sharply limited, a subsequent decision of the Fifth Circuit, *Campbell v. Fields,* 229 F.2d 197 (5th Cir. 1956), quotes at length from the *Bliss* case and states that it was not overruled by *Jones Estate v. Commissioner of Internal Revenue,* 127 F.2d 231 (5th Cir. 1942).

hold was the subject of the dispute in the Gulf litigation and therefore, that plaintiff incurred the attorney's fees in defense of its title. Twelve years after the establishment of the trust involved in the *Moore* case, testator's widow renounced her interest in a portion of the trust assets. The action which gave rise to the tax deductions was a suit brought by the testator's two children in which they unsuccessfully contended that the release and renunciation by the widow acted to accelerate their beneficial remainder interest in the renounced property and that the trustee should hold the property and administer the trust as if the widow had died. Here Gulf unsuccessfully contended in the Texas courts that the action of the Texas Railroad Commission prolonged its interest in the leased property and that Gulf should retain its interest and continue as lessee beyond the expiration of the lease. The *Moore* court held that although title was incidentally involved, the trustee's primary purpose in defending his title to the assets was to obtain a decision on the timing of the remainderman's rights. The answer to this question was vital to the trustee's administration of the trust and the Tax Court allowed the deduction. Here, even though title was incidentally involved in the litigation, the real question between Gulf and Southland was one of timing— whether plaintiff's interest would take effect in 1975, as it contended or at a later time, as Gulf contended. The answer to this question was vital to Southland's operation of the properties in order to aid it in the management thereof for the production of income. The trial judge correctly held that the legal issue in the Gulf litigation was "the longevity of the oil and gas lease on the land and whether delays in the production of oil and gas from the land attributable to proration orders issued by the Texas Railroad Commission should or should not be counted in determining the date on which the 50-year term of the lease would expire." The Government does not challenge this determination of the trial

judge. Thus, even though title was incidentally involved, I think that the cases I have cited strongly support a holding that it was not the primary purpose of plaintiff's defense to Gulf's suit to defend or perfect plaintiff's title. Therefore, I think that plaintiff's claim for refund falls within the rule stated by the court in *Industrial Aggregate Company v. United States*, 284 F.2d 639, 645, 647 (8th Cir. 1960).

* * * On the other hand, even though title may be involved, if its defense or perfection is not the primary purpose of the litigation, the expenditures do not encounter the barrier of the regulation's standard and they may qualify instead as ordinary and necessary expenses. * *

\* \* \* \* \* \*

Thus * * * the *primary* purpose of Oakland's [lessor's] institution of the state court litigation, of the taxpayer's [lessee's] defense of it, and of both parties in effecting the settlement, was one and the same, namely, the resolution of the issue of the taxpayer-lessee's alleged violations of the operating covenants of the four leases. That the determination of this issue involved the taxpayer's consequent right, or lack of right, to the extension, and thus involved continuing title to the leaseholds as extended, does not make this purpose any less primary.

From the facts found by the trial judge and accepted by both parties, it seems clear to me that plaintiff's primary purpose in defending the suit brought by Gulf was, as stated by plaintiff, "to permit it to make definitive plans for the operation of the Waddell property upon a confirmation of the July 14, 1975, expiration date and to collect the ordinary income to accrue to its reversionary interest." [3]

In the Texas litigation, there was no dispute over title and therefore it was not necessary for plaintiff either to defend or perfect its title to the land. Obviously, there was no capital acquisition resulting

3. Plaintiff's moving brief at p. 35.

from the litigation. Consequently, I would hold as did the trial judge that plaintiff's 1967 and 1968 legal expenses were deductible for income tax purposes under section 162(a) of the 1954 Code, as ordinary and necessary business expenses.