NCNB CORPORATION, a North Carolina Corporation; North Carolina National Bank, Appellees,

v.

UNITED STATES of America, Appellant.

No. 78–1771.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 6, 1981.

Decided July 13, 1982.

14. *See, e.g., Simons v. United States*, 119 F.2d 539 (9th Cir. 1941); *Freeman v. United States*, 227 F. 732 (2d Cir. 1915).

Jonathan S. Cohen, Tax Div., Dept. of Justice, Washington, D. C. (Harold M. Edwards, U. S. Atty., Asheville, N. C., M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Aaron Rosenfeld, Tax Div., Dept. of Justice, Washington, D. C., on brief), for appellant.

E. Osborne Ayscue, Jr., Charlotte, N. C. (John W. Johnston, William H. Higgins, Helms, Mulliss & Johnston, Charlotte, N. C., on brief), for appellees.

Before WINTER, Chief Judge, and BUTZNER, RUSSELL, WIDENER, HALL, MURNAGHAN, SPROUSE, ERVIN and CHAPMAN, Circuit Judges.

WIDENER, Circuit Judge:

Appellee taxpayers, North Carolina National Bank and its parent NCNB Corporation, were granted a rehearing en banc of the panel decision in *NCNB Corporation v. United States*, 651 F.2d 942 (4th Cir. 1981), which reversed the district court and held for the United States. We now vacate the panel decision and affirm the judgment of the district court, although our reasoning may not be the same. *S. E. C. v. Chenery*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

I

At issue in this case is the proper treatment, for purposes of income tax computation, of certain expenditures incurred by NCNB in activities connected with its statewide branch banking system. North Carolina National Bank was formed in 1960 through the merger of banks in Charlotte and Greensboro; in subsequent years, NCNB, through other mergers and the opening of branches in numerous North Carolina cities, has become the largest bank in the state. In the period between 1970 and 1973, for instance, the bank opened 57 new branches, including 21 offices in cities where the bank had not previously had operations.

As part of the expansion process and as a part of branch banking which is its business, NCNB incurred a variety of expenses. Besides the obvious cost of constructing and equipping new facilities, the bank conducted various market and feasibility studies, devoted staff time to planning and implementing expansion projects, and completed the process by applying for permission from the Comptroller of the Currency to open and relocate various facilities. During the years 1965–70 the bank capitalized the costs connected with building and equipping new facilities, pursuant to Internal Revenue Code § 263. The taxpayer, however, deducted as current expenses other costs incurred in the expansion process, pursuant to IRC § 162. The Commissioner of Internal Revenue asserted a deficiency with respect to the bank's tax returns, arguing that the costs taken as current expenses actually

should have been capitalized.[1] The Commissioner maintained that none of the expenditures were current expenditures because they related to the production of future income. (651 F.2d at 947). The taxpayer paid the assessed deficiencies and then timely sued for refunds in the district court. The trial court held for NCNB, concluding that the opening of a new branch bank "produces nothing corporeal or salable. It does not create a capital asset within the meaning of the Internal Revenue Code of 1954." The expenditures at issue were thus ordinary and necessary expenses and deductible under IRC § 162(a), it held.

This court's panel concluded, however, that the district court had applied an incorrect legal standard and reversed. 651 F.2d at 947. The panel majority reasoned that the propriety of deducting expenses must be considered in light of "[t]he rule expressed... [in *Richmond Television Corp. v. United States*, 345 F.2d 901, 907 (4th Cir.), *vacated on other grounds*, 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143, *original holding on this issue reaffirmed*, 354 F.2d 410 (4th Cir. 1965)] requiring the matching of revenues and costs in the appropriate accounting period...." 651 F.2d at 948. The panel concluded that benefits from the expenditures in question extended beyond the individual accounting years and thus the taxpayer could not deduct them as current expenses in the years incurred. *Id.* at 962–63.

## II

The question of whether particular expenditures are more properly charged to current expense or capitalized has long been a point of contention between those taxed and the Internal Revenue Service. It is unnecessary for us to explain the accounting behind these confrontations as it is adequately explored in the panel opinion and elsewhere. 651 F.2d 948–53. *E.g.* S. Davidson, J. Schindler, C. Stickney & R. Weil, Financial Accounting, 279–299 (1976). It should be noted, though, that neither courts nor the accounting profession have devised a universal, foolproof method of distinguishing current expenses from capital costs. As the Court remarked: "The standard set up by the statute is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle." *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933).

Section 162(a) of the Internal Revenue Code sets forth five criteria for evaluating whether an expenditure is a current expense.

> [A]n item must (1) be "paid or incurred during the taxable year," (2) be for "carrying on any trade or business," (3) be an "expense," (4) be a "necessary" expense, and (5) be an "ordinary" expense.

*Commissioner v. Lincoln Savings & Loan Association*, 403 U.S. 345, 352, 91 S.Ct. 1893, 1898, 29 L.Ed.2d 519 (1971). The principal issue in this case as in most such cases is whether the expenditure is "ordinary and necessary." The Supreme Court has grappled with the problem several times, initially in *Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933). In *Welch*, a former officer of a bankrupt corporation paid several debts incurred by the corporation and then sought to deduct the expense as a cost necessary to protect his reputation. *Id.* at 112–13, 54 S.Ct. at 8–9. The Commissioner of Internal Revenue argued that the expenditures were capital in nature because they were not ordinary expenditures for an individual to make. *Id.* at 115, 54 S.Ct. at 9. The Supreme Court agreed, noting, "Repu-

---

1. It is important to recognize that none of the challenged deductions pertain to the buildings or equipment acquired as part of the expansion program. The challenged expenditures total $1,029,480.50 over the 1965–70 period. This figure includes $199,480.50 in external expenditures for consultant, attorney and governmental fees and $830,000 for an allocation of internal expenditures. It appears from various documents that the IRS divided some of these figures by a factor of four before computing the amount of tax owed. It is not clear from the record and the briefs how the IRS arrived at the allocation of internal costs or why it divided the claimed current expenses by four before reducing the deduction and computing unpaid taxes. Such computations are not before us on appeal.

tation and learning are akin to capital assets.... The money spent in acquiring them is well and wisely spent. It is not an ordinary expense." *Id.* at 115–16, 54 S.Ct. at 9–10.

The Court has considered differences between capital and current expenditures several times subsequently,[2] but most decisively in *Commissioner v. Lincoln Savings & Loan Association,* 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971). *Lincoln Savings & Loan* concerned the deductibility of a payment by a savings institution to a reserve fund held by a federal agency. *Id.* at 348, 91 S.Ct. at 1896. In deciding whether the payment was a contribution to an asset or an expense, the Court said:

> What is important and controlling, we feel, is that the ... payment serves to create or enhance for Lincoln what is essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment is capital in nature and not an expense, let alone an ordinary expense, deductible under § 162(a)...

403 U.S. at 354, 91 S.Ct. at 1899. While concluding that the contribution to the reserve fund was capital, the Court in *Lincoln Savings & Loan* specifically rejected the argument that the expenditure was not deductible simply because it had an effect beyond one year:

> [T]he presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective benefit beyond the taxable year.

*Id.*[3]

The latter language is particularly important in light of the decisions in this circuit, including the panel decision at hand, which hold that expenditures providing benefits for a taxpayer beyond one year must be capitalized. This court adopted the one-year rule in *Richmond Television Corp. v. United States,* 345 F.2d 901 (4th Cir. 1965), *vacated on other grounds,* 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143, *original holding on this issue reaffirmed,* 354 F.2d 410 (4th Cir. 1965), where we said:

> Our system of income taxation attempts to match income and expenses of the taxable year so as to tax only net income. A taxpayer may, therefore, not deduct as a current business expense the full cost of acquiring an asset, tangible or intangible, which benefits the taxpayer for more than one year. The concept has been explained in *United States v. Akin,* 248 F.2d 742, 744 (10th Cir. 1957).
>
> > "[A]n expenditure should be treated as one in the nature of a capital outlay if it brings about the acquisition of an asset having a period of useful life in excess of one year, or if it secures a like advantage to the taxpayer which has a life of more than one year."

345 F.2d at 907 (footnote omitted). We subsequently applied the one-year rule in *Darlington-Hartsville Coca-Cola Bottling Co. v. United States,* 393 F.2d 494 (4th Cir.), *cert. denied,* 393 U.S. 962, 89 S.Ct. 402, 21 L.Ed.2d 376 (1968) (amounts spent to purchase soft drink syrup contracts were capital expenditures), and *Georator Corp. v. United States,* 485 F.2d 283 (4th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974) (legal fees for resisting cancellation of trademark were capital expenditures). The one-year rule is certainly

2. *E.g. Helvering v. Winmill,* 305 U.S. 79, 59 S.Ct. 45, 83 L.Ed. 52 (1938); *Deputy v. duPont,* 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416 (1940); *Interstate Transit Lines v. Commissioner,* 319 U.S. 590, 63 S.Ct. 1279, 87 L.Ed. 1607 (1943); *Commissioner v. Heininger,* 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171 (1943); *Commissioner v. Tellier,* 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966); *Woodward v. Commissioner,* 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970); *United States v. Hilton Hotels Corp.,* 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970); *United States v. Mississippi Chemical Corp.,* 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed.2d 217 (1972); *Commissioner v. Idaho Power Co.,* 418 U.S. 1, 94 S.Ct. 2757, 41 L.Ed.2d 535 (1974).

3. The one-year rule may still apply in situations involving capital investments in banks for cooperatives created under the Farm Credit Act of 1933, 12 U.S.C. §§ 1134 et seq. *United States v. Mississippi Chemical Corp.,* 405 U.S. 298, 310, 92 S.Ct. 908, 915, 31 L.Ed.2d 217 (1972).

appealing in its conceptual simplicity, but as the *Lincoln Savings & Loan* opinion notes, numerous expenses with effects beyond one year are readily deductible. One need not consider further than the case of the corporate executive who spends a significant, though indeterminable, amount of his time on future planning to realize that universal application of the one year rule is impossible and that it has not been so applied in such cases.

The Tenth Circuit, from which we adopted the one-year rule, has said subsequently:

> In our search for a more definite formula for the resolution of the line-drawing process, we evolved what may be called the "one-year" rule of thumb, under which an expenditure should be capitalized "if it brings about the acquisition of an asset having a period of useful life in excess of one year or if it secures a like advantage to the taxpayer which has a life of more than one year." *Hotel Kingkade v. Commissioner of Internal Revenue*, 10 Cir., 180 F.2d 310, 312. This concept has received rather wide acceptance, and we are urged to make arbitrary application of it here. We think, however, that *it was intended to serve as a mere guidepost for the resolution of the ultimate issue*, not as an absolute rule requiring the automatic capitalization of every expenditure providing the taxpayer with a benefit enduring for a period in excess of one year. Certainly the expense incurred in the replacement of a broken windowpane, a damaged lock, or a door, or even a periodic repainting of the entire structure, may well be treated as a deductible repair expenditure even though the benefits endure quite beyond the current year.

4. This statement is intended to forestall future difficulties between panels as to whether *Lincoln Savings & Loan* has superseded *Richmond TV*, et al., in this circuit as to the proper application of the one-year rule, for we hold that it has. Our problem with a panel holding that a Supreme Court decision has superseded an earlier panel decision was noted in *Chisholm v. U. S. Postal Service*, 665 F.2d 482 (4th Cir. 1981). Cf. *Brown v. Eckerd Drugs, Inc.*, 663 F.2d 1268

*United States v. Wehrli*, 400 F.2d 686, 689 (10th Cir. 1968) (footnote citing *Richmond Television* and the district court opinion in *Darlington-Huntsville* as examples of cases utilizing the one-year rule has been omitted; emphasis added); *accord Southland Royalty Co. v. United States*, 582 F.2d 604 (Ct.Cl.1978), *cert. denied*, 441 U.S. 905, 99 S.Ct. 1991, 60 L.Ed.2d 373 (1979).

In light of the unmistakable language in *Lincoln Savings & Loan* that "the presence of an ensuing benefit . . . is not controlling," we conclude that such parts of *Richmond Television, Darlington-Huntsville,* and *Georator* as may be interpreted as establishing a one-year standard for distinguishing between capital and current costs, are no longer authoritative.[4] This does not mean that courts are to ignore the long term characteristics of expenditures in deciding whether particular costs are capital or current; rather, the length of the ensuing benefit is but one factor under consideration.

### III

We turn now to application of the *Lincoln Savings & Loan* standard to the facts before us. The expenditures in question are of three types: metro studies, feasibility studies, and applications to the Comptroller of the Currency. Metro studies were long range planning reports making recommendations and plotting strategies for NCNB in various regions of North Carolina. These studies concerned both existing facilities and expansion opportunities and were prepared both internally and by outside consultants. Feasibility studies focused on particular proposed branch locations, evaluating the economics of various options. Preparation of these reports came after metro studies. (651 F.2d at 946–47). Ap-

(4th Cir., 1981), slip op. at 16–17 (applying *Barnett v. W. T. Grant Co.*, 518 F.2d 543 (4th Cir. 1975), with *Hill v. Western Electric Co.*, 596 F.2d 99, 101, *cert. denied*, 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186 (1979), which declined to apply *Barnett* for the stated reason that it had been superseded by *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977).

plications to the Comptroller were for the statutorily required permission for a nationally chartered bank to open branch offices.[5] Costs incurred included the application fee, internal staff time in preparation of the application, and attorneys' fees and related expenses connected with prosecution of the application.

▮ It is important to recognize that all of these expenses were connected with NCNB's developing and operating a statewide network of branch banking facilities. In order to maintain its position in the industry, NCNB found it necessary to continually explore the market for its varied services and facilities. It is a long recognized principle of tax law that expenditures for the protection of an existing investment, the continuation of an existing business, or the preservation of existing income from loss or diminution are ordinary and necessary business expenses within the meaning of IRC § 162. *Briarcliff Candy Corp. v. Commissioner of Internal Revenue*, 475 F.2d 775, 787 (2nd Cir. 1973).[6]

The Second Circuit's *Briarcliff* opinion is of particular interest in the case before us. *Briarcliff* involved a candy company which had sold its products primarily through a chain of company owned stores in urban centers. Demographic changes forced the company to seek markets for its products in suburban areas. When company owned suburban stores failed to attract satisfactory business, the company decided to develop a network of franchised dealers. 475 F.2d at 777. The company, in preparing its income tax returns, treated the costs of developing the network, such as sales calls and advertisements in trade magazines, as deductible expenses. The Commissioner disallowed the deductions, however, reasoning that these promotional expenses were distinct from the operating expenses of the

franchise division. The Commissioner said the expenses were actually capital in nature because they were incurred in obtaining 159 dealer contracts. The contracts were said to constitute the capital assets of the franchise division. *Id.* at 778–80. The Second Circuit, citing *Lincoln Savings & Loan*, rejected the Commissioner's argument that the expenditures were capital in nature because benefits from them extended into future years. *Id.* at 785–86. The court said the expenditures would be capital only if they served to create or enhance a separate and distinct additional asset. Turning to the issue of whether the contracts were such assets, the court stated that an expenditure is a "capital asset" only if "at the time it is furnished to the company, it has an ascertainable and measurable value— that is, a value in money or a fair market value." *Id.* at 784. Noting that there is no special statutory definition of "capital asset" for IRC §§ 162 and 263,[7] the court said the term must be taken in its "usual and customary business sense as items of ownership of a permanent or fixed nature which are convertible into cash." 475 F.2d at 786. The Second Circuit concluded that the contracts were not capital assets and thus expenses incurred in obtaining them were not capital costs. *Id.* at 787. The *Briarcliff* reasoning is applicable in the instant case because NCNB, like the *Briarcliff* taxpayer, was expanding its business into new territories. We do not, however, hold as determinative the fact that the branch banks could not be turned into cash. But that is a factor to consider in determining whether they were "separate and distinct additional asset[s]" within the meaning of *Lincoln Savings & Loan.* The costs NCNB incurred in exploring such expansion are analogous to the costs in *Briarcliff* for developing the franchise network. Particularly relevant is the Second Circuit's rejection of the Com-

5. Also included in this category were expenses incurred in securing permission from Bahamian authorities to open a branch there.

6. *E.g., Allen v. Commissioner*, 283 F.2d 785, 790–91 (7th Cir. 1960); *Lutz v. Commissioner*, 282 F.2d 614, 620 (5th Cir. 1960).

7. While IRC § 1221 defines "capital asset," it does so for the purpose of determining capital gains and losses and not for determining what expenditures are capital. *See Georator Corp. v. United States*, 485 F.2d 283, 285 (4th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974).

missioner's argument that the possible long term benefits of such expenditures mandated their capitalization.

Also applicable to the case before us is a series of cases, including one from this circuit, which have dealt with the costs incurred by banks in developing credit card systems. *First Security Bank of Idaho v. Commissioner of Internal Revenue*, 592 F.2d 1050 (9th Cir. 1979); *Iowa-Des Moines National Bank v. Commissioner of Internal Revenue*, 592 F.2d 433 (8th Cir. 1979); *First National Bank of South Carolina v. United States*, 558 F.2d 721 (4th Cir. 1977); *Colorado Springs National Bank v. United States*, 505 F.2d 1185 (10th Cir. 1974). The facts are generally the same in each case. The banks began issuing Master Charge or BankAmericard credit cards either directly or through cooperative organizations, and, in the process, incurred various start-up expenses such as computer costs, computer services, advertising, credit bureau reports, travel, educational and entertainment expenses, and temporary clerical services, all of which were claimed as ordinary business expenses. In *First National Bank of South Carolina*, the taxpayer incurred its costs as part of an assessment by a cooperative association of which it was a member. We held that the assessment was not a membership fee and quoted approvingly from the *Colorado Springs* decision where the Tenth Circuit said:

> The start-up expenditures here challenged did not create a property interest. They produced nothing corporeal or salable. They are recurring. At the most they introduced a more efficient method of conducting an old business. 505 F.2d at 1123.

*First National Bank of South Carolina*, 558 F.2d at 723. Once again, the persuasive factual similarity between the credit card cases and the instant case is that costs incurred in expanding a business are not considered capital costs unless they meet the *Lincoln Savings & Loan* "separate and distinct additional asset" test. And this test holds whether or not the expenditures have benefits beyond the current taxation period. *See also Malmstedt v. Commissioner*, 578 F.2d 520 (4th Cir. 1978) (costs incurred by real estate developer in carrying commercial land were deductible even though most of her previous experience was with residential development); *York v. Commissioner*, 261 F.2d 421 (4th Cir. 1958) (cost of hiring consultant to consider suitability of real estate development venture was deductible for real estate developer).

Still another indication that the expenditures in question are current expenses rather than capital costs is recent legislation dealing with amortization of certain expenses incurred by new businesses. A new statute, IRC § 195, provides that new businesses may apply a special amortization treatment to such expenditures if the costs would have been deductible,

> if paid or incurred in connection with the expansion of an existing trade or business (in the same field as the [new] trade or business ...), would be allowable as a deduction for the taxable year in which paid or incurred.

IRC § 195(b)(2). As an example of expenditures which would be allowable deductions for an existing business, the Senate Report that accompanied § 195 explained:

> Under the provision, eligible expenses consist of investigatory costs incurred in reviewing a prospective business prior to reaching a final decision to acquire or to enter that business. These costs include expenses incurred for the analysis or survey of potential markets, products, labor supply, transportation facilities, etc.

S.R.Rep.No.1036, 96th Cong., 2d Sess. 11, *reprinted in* [1980] U.S.Code Cong. & Ad. News 7293, 7301. Congress is thus under the impression that expenditures for market studies and feasibility studies, as at issue here, are fully deductible if incurred by an existing business undergoing expansion. An interpretation by us to the contrary would render § 195 meaningless for it would obliterate the reference point in the statute—"the expansion of an existing trade or business."

The government calls our attention to several cases which it says have held that

license fees and other costs incurred in securing operating permits must be treated as capital expenditures which, at best, can be amortized over the life of the license.[8] We do not find such cases persuasive for several reasons. First, some of the cases were based on the one-year rule and held that the expenses were not deductible because the licenses extended beyond one year. *E.g., Chandler Trailer Convoy, Inc. v. Commissioner*, P–H Memo. T.C., ¶ 73,285 at 1322–73 (1974); *Radio Station WBIR, Inc. v. Commissioner*, 31 T.C. 803, 815 (1959). *Lincoln Savings & Loan's* rejection of the one-year rule as determinative renders such reasoning unpersuasive.

Additionally, some of the cases rejected the argument that the license was for expansion of an already active business. *E.g., Chandler*, supra (not an expansion of business for a truck line to seek routes nationwide as opposed to more limited areas); *WHEC, Inc. v. Commissioner*, 37 T.C. 821 (1962) (not an expansion of business for a radio broadcaster to seek a television license for the business was not previously existing); *Radio Station WBIR, supra; cf. All States Freight, Inc. v. United States*, 72 F.Supp. 673 (N.D.Ohio 1947) (taxpayer may deduct costs of contested proceeding in obtaining operating license where license not previously required). By contrast, we have determined, which determination is compelled by the record, that NCNB's branching activities are an established part of its regular operations, an expansion thereof.

Furthermore, it is important to note that the Comptroller's permission to open a branch bank is factually different from certain other government licenses. The approval, if given, is only to "establish and operate [a] new branch[...]." 12 U.S.C. § 36(c). It is not an exclusive territorial franchise; it is not transferable; and the branch bank is not readily salable as such. A branch bank has no value except its tangible and real assets apart from its parent as contrasted to the immense value of a

TV station with construction permit or license, for example, which is the type of license usually encountered, and upon which precedents the government relies.

Still another reason for allowing NCNB to treat these expansion costs as current expenses is that such accounting is required by the Comptroller of the Currency. In an August 21, 1972 letter to the Assistant Secretary for Tax Policy, U. S. Treasury Department, the Comptroller wrote:

> It is the long-established policy of this office to require National Banks to charge to current operations all expenditures relating to the development and expansion of banking services, including those incurred in credit card programs. This policy has as its basis our responsibility of assuring the solvency and liquidity of National Banks and the concurrent protection of depositories and shareholders.

*See First National Bank of South Carolina v. United States*, 413 F.Supp. 1107, 1112 (D.S.C.1976), *aff'd*, on the opinion of the district court, 558 F.2d 721 (4th Cir. 1977). Normally, the IRS recognizes the taxpayer's regular accounting method as the proper basis for computing taxes. Section 446 of the Internal Revenue Code provides:

> Section 446 General Rule for Methods of Accounting
>
> (a) General Rule—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping with his books.
>
> (b) Exceptions—. . . [I]f the method used does not clearly reflect income, the computation of taxable income shall be made under such method as in the opinion of the Secretary does clearly reflect income.

When the taxpayer's accounting method is one specified by a governmental agency regulating the taxpayer, the Supreme Court has said:

> [W]here a taxpayer's generally accepted method of accounting is made compulsory

---

**8.** *E.g., Dustin v. Commissioner*, 467 F.2d 47 (9th Cir. 1972); *Champlin Coach Lines v. Commissioner*, 138 F.2d 904 (2nd Cir. 1943); *Chandler Trailer Convoy, Inc. v. Commissioner*, P–H Memo T.C., ¶ 73,285 (1973); *WHEC, Inc. v. Commissioner*, 37 T.C. 821 (1962); *Radio Station WBIR, Inc. v. Commissioner*, 31 T.C. 803 (1959).

by the regulatory agency *and* that method clearly reflects income, it is almost presumptively controlling of federal income tax consequences.

*Commissioner v. Idaho Power Co.*, 418 U.S. 1, 15, 94 S.Ct. 2757, 2765, 41 L.Ed.2d 535 (1974) (emphasis in original, footnote quoting § 446 omitted). Thus, in the instant case, the Comptroller's accounting method is presumptively controlling as long as it accurately reflects income.

There is little doubt that the charging of expansion costs to current expenses represents a conservative accounting policy and, in fact, differs from that required of certain other federally regulated industries.[9] Nevertheless, it is readily apparent to us that banking is a unique industry and that the Comptroller of the Currency has much more control over the daily operations of banks than regulators have over most other industries. The basis for this control, of course, is the overriding public interest in the stability and solvency of the nation's financial institutions. What would be routine ministerial functions in many other businesses require the express permission of the Comptroller when performed by a national bank.[10] Banks are severely limited in the amount of loans they may make, the size of loans to individual customers, and the relationship between loans and deposits. Furthermore, banks are unique in that a substantial portion of their assets must be readily available, as cash, for claims by their depositors on demand. To insure that a bank can meet these obligations, it must have an accounting system which gives an extraordinarily accurate picture of its financial position. Assets which cannot be quickly redeemed, or even redeemed at all, such as the items at issue here, are of little benefit to the liquidity of the bank when carried on its books as a capital asset. We think the Comptroller is in a unique position of expertise to determine what accurately reflects a bank's income. Thus, we conclude that NCNB should be entitled to the presumption explained in the *Idaho Power* decision.

We repeat for the purpose of emphasis that the land, building, and equipment costs of the branch banks already have been charged to a capital account rather than to current expenses. Also, such things so intimately connected with a particular branch as attorneys' fees for examination of the title to real estate also have been charged to capital rather than to expense. The money spent or obligated for metro studies, feasibility studies, and applications to the Comptroller of the Currency, it seems to us, adds nothing to the value of a bank's assets which can be so definitely ascertained that it must be capitalized. Certainly no "separate and distinct additional asset" is created. While the benefit of all of these classes of expenses may or may not endure for more than one year, that is but one factor to be considered. The branch has no existence separate and apart from the parent bank; as a branch bank, it is not readily salable and has no market value other than the real estate which it occupies and the tangible equipment therein.

## IV

In conclusion, we emphasize that NCNB's business is operating a statewide network

---

**9.** It is the policy of the Interstate Commerce Commission, for example, to require truck lines to capitalize the fees and other expenditures connected with procuring franchises, permits, consents and certificates which have a term of greater than one year. 49 C.F.R. Part 1207, especially Account 1321 (1981). In this connection, we note that NCNB is caught in an argument between two subordinates of the Secretary of the Treasury, the Director of Internal Revenue on the one hand and the Comptroller of the Currency on the other. Not that NCNB would fare any better, but the disagreement between these two officials as to the proper way to treat the expenses in question could far more easily have been settled by the Secretary of the Treasury than by the courts.

**10.** Among the activities of a national bank which require approval of the Comptroller are: change of name, 12 U.S.C. § 30; change of location, *id.*; consolidation of national banks, 12 U.S.C. § 33; conversion from state to national bank, 12 U.S.C. § 35; relocation of a branch office, 12 U.S.C. § 36(e); issuing preferred stock, 12 U.S.C. § 51a; exercising trust powers, 12 U.S.C. § 92a; and investing in physical premises, 12 U.S.C. § 371d.

of branch banks. In order to maintain this network, NCNB must continually evaluate its market position through various means that utilize both internal and external resources. It has every right to keep abreast of demographic trends and the like in its necessary allocation of resources as well as in ascertaining where the public demand for its services exists. The bank must regularly take actions such as the opening and closing of branches so as to maintain profitability and a sound financial position. Where these actions result in the creation or retirement of separate and identifiable assets such as buildings and equipment, then the taxpayer must make adjustments to its capital accounts. But where these expenditures do not create or enhance separate and identifiable assets, they are properly considered "ordinary and necessary." IRC § 162(a).

The judgment of the district court is accordingly

AFFIRMED.

MURNAGHAN, Circuit Judge, dissenting:

Neither reargument by counsel, nor eloquence of Judge Widener writing for the *en banc* majority convinces me that the panel opinion[1] coming to the opposite conclusion was erroneous.

First, I find altogether unpersuasive the determination that an established line of four circuit decisions[2] must be rejected on the basis of a non-specific *obiter* statement in *Commissioner v. Lincoln Savings & Loan Association*, 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971).[3] The *holding* in *Lincoln Savings* was that the expenditure was capital in nature and so "not an expense, let alone an ordinary expense, deductible under § 162(a)."[4] The aside that "the presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective benefit beyond the taxable year"[5] says nothing about what expenditures having some enduring aspects are, and what ones are, not, deductible. Obviously, the amounts fought over in *Richmond Television, Darlington-Hartsville* and *Georator* were not "concededly deductible."

In my majority panel opinion I pointed out simply that it was not a case for decision on an "all or nothing" basis, but that rather individual attention had to be paid to the several distinct items, to determine whether they were ordinary and necessary, and so deductible, expenses, or whether they should be capitalized. Life in excess

1. *NCNB Corporation v. United States*, 651 F.2d 943 (4th Cir. 1981).

2. *Richmond Television Corp. v. United States*, 345 F.2d 901 (4th Cir. 1965), *vacated on other grounds*, 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143 (1965), *original holding on this issue reaffirmed*, 354 F.2d 410 (4th Cir. 1965); *Darlington-Hartsville Coca-Cola Bottling Co. v. United States*, 393 F.2d 494 (4th Cir. 1968), *cert. denied*, 393 U.S. 962, 89 S.Ct. 402, 21 L.Ed.2d 376 (1968); *Georator Corp. v. United States*, 485 F.2d 283 (4th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974).

3. The decision in one of the three cases, *Georator Corp.*, was handed down well after the opinion in *Lincoln Savings* was promulgated. The distinguished panel in *Georator Corp.*, consisting of Judge (now Chief Judge) Winter and Judges Butzner and Field, were fully aware of *Lincoln Savings*, yet perceived no consequence such as Judge Widener now purports to derive from that case. At pages 284–85 of 485 F.2d the following appears:

Our analysis of this question begins with the principle of taxation reflected in Section 162(a) of the Internal Revenue Code that an expenditure securing benefits which are realized and exhausted in the same tax period is fully deductible in that tax period. Conversely, an expenditure securing benefits beyond the taxable year must be capitalized. *Darlington-Hartsville Coca-Cola Bot. Co. v. United States*, 393 F.2d 494 (4 Cir. 1968); *Richmond Television Corporation v. United States*, 345 F.2d 901 (4 Cir. 1965).
. . . .
... It is also clear that Section 263 of the Code, 26 U.S.C. § 263, which disallows deductions for expenditures which increase the value of any property, does not provide a complete or exhaustive list of nondeductible expenditures. *Commissioner v. Lincoln Savings & Loan Assn.*, 403 U.S. 345, 358, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971).

4. 403 U.S. at 354, 91 S.Ct. at 1899.

5. *Id.*

of one year remains a prominent, indeed a predominant, characteristic of a capital item, even though something other than duration of existence may prove controlling in some circumstances—not specified in *Lincoln Savings*, and manifestly the exceptions rather than the rule.

Second, I view somewhat wryly the controlling weight accorded by the *en banc* majority to justification language set forth in the legislative history of the new Internal Revenue Code Section 195. *See* S.Rep. No.1036, 96th Cong., 2d Sess. 11, *reprinted in* [1980] U.S.Code Cong. & Ad.News 7293, 7301. The section was designed to benefit taxpayers by permitting them to elect to amortize, over a period no shorter than five years, expenditures which otherwise, insofar as the characteristics with which we are here concerned matter, would be recognized as deductible. The nature of the expenditures—planning costs—were like those with which we are here confronted, except that they involved start-up expenditures for new, rather than for existing businesses.

The nondeductibility perceived as requiring amelioration when IRC § 195 was passed arose not from the length of life of an expenditure, but from the non-business nature of expenditures paid or incurred before a new business began operation. Those expenditures were nondeductible whether their life spans were ten days or ten years. S.Rep.No. 1036, *supra*, at 7300.

Insofar as IRC § 195 is concerned, it is relevant to observe, at the outset, that amortization is a way, for tax purposes, to deal with capital items, not customarily a way to deal with items of ordinary and necessary expense. The statute thus focuses on broadening of the category of capital expenditure, not on an expansion of the deductible category. My panel opinion called for determinations to be made as to whether expenditures not qualifying for immediate 100% deduction should be amortizable, and, if so, over what duration of time. Such items not qualifying for 100% deductibility status under law extant when IRC § 195 was adopted were explicitly not the subject of, or affected by, IRC § 195. Ex-penditures amortizable at the taxpayer's election had to be such as "if paid or incurred in connection with the expansion of an existing trade or business . . . *would be allowable as a deduction* for the taxable year in which paid or incurred." 26 U.S.C. § 195(b)(2) (emphasis supplied).

It requires a giant, and unjustified leap, to derive from the justification set out in the legislative history any support for the proposition that *all* investigatory costs are automatically deductible, irrespective of length of life. Eligible expenses under IRC § 195 include "investigatory costs incurred in reviewing a prospective business prior to reaching a final decision to acquire or to enter that business." S.Rep.No.1036, *supra*, at 7301. But that is only one of the qualifications. In addition, to qualify as an eligible expense, an expenditure "must be one which would be allowable as a deduction for the taxable year in which it is paid or incurred if it were paid or incurred in connection with the expansion of an existing trade or business." *Id.*

Thus, the legislative history does not purport to say that all investigatory costs are deductible. To the contrary, it explicitly limits its application solely to those investigatory costs which are deductible in nature. The implication is inescapable that there are other investigatory costs which are not deductible, *i.e.* are to be capitalized. Consequently, we are brought straight back to the question we started with: In the case of each expenditure, was it deductible, or capitalizable? Hence, I submit that the authority relied on is illusory and not supportive of the conclusion reached by the *en banc* majority.

To sum it all up, we have here a case where an opportunity to resort to the golden mean is ignored. Start-up expenditures and other expenditures like start-up expenditures except that they concern existing businesses often have multi-year lives or applications. In such cases they should not be immediately fully deductible in the year paid or incurred as ordinary and necessary expenses. Rather they should be capitalized and prorated. That is to say that

they should, over time, be deductible for income tax purposes, but not all at once, in one fell swoop.

Apparently Congress, in recently enacting IRC § 195 first decided that complete denial of any deductibility was unfair and unwise and that existing law to that effect should be changed. Second, Congress evidently appreciated that, as a matter of economic fact, a new enterprise often must operate, at the outset, at a loss, perhaps over a period of several years. Congress presumably appreciated that a new business could well see the losses altogether evaporate as deductions, because there had been no profit against which to apply them. Such a state of affairs would be inconsistent with a congressional desire to encourage formation of new businesses and the probable resulting increase in employment. So an election to amortize was extended to taxpayers to permit them to take some portions of early year expenditures as deductions in later, more probably profitable, years.

Congress by enacting IRC § 195 thus only emphasized the nature as capital, rather than as ordinary and necessary expenses, of the exploratory expenditures category. The congressional legislation, therefore, is fully consistent with, and strongly supports the result reached in my panel majority opinion. There is simply no justification for reading the legislative history as making *more* deductible than theretofore exploratory expenditures for existing businesses. To the extent such expenditures had been recognized as having the character of ordinary and necessary expenses (primarily short life span) they should remain deductible, and their counterparts among expenditures for new businesses, by IRC § 195, are made, at the taxpayer's election, amortizable. To the extent expenditures for existing businesses have characteristics of longer life, they will remain capitalizable. That is all that IRC § 195 and its justification language say. That is all that they should be deemed to mean.

Otherwise, a result constituting a substantial tax windfall—the immediate de-

ductibility of *all* expenditures of a specific class,. however capital in nature they may be, will result. Taxes are eminently practical, of course. On the basis of that slogan, we uphold enactments whose fairness seems suspect to us, if we are sure Congress meant the apparent unfairness. *See Struthers v. United States*, 442 F.Supp. 562, 564 (D.Minn.1977); *Commissioner of Internal Revenue v. Caulkins*, 144 F.2d 482, 484 (6th Cir. 1944). Here, however, the legislative enactment of IRC § 195 does not directly relate to the tax status of expenditures for existing businesses at all. The legislative history, properly read, in no way compels the erection of a large, unreasonable and inherently unfair tax preference. Other taxpayers must capitalize and not deduct all at once expenditures having extended lives or applications. The taxpayer here, and others, preeminently banks, who will benefit from the decision of the *en banc* majority, can by no means merit description as "economically deprived." The benefit heaped upon them further contributes to the deserved description of our income tax system as a disgrace.

I dissent.