PAUL J. KAHLE AND VANESSA A. KAHLE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kahle v. Commissioner
Docket No. 5633-89
United States Tax Court
T.C. Memo 1991-203; 1991 Tax Ct. Memo LEXIS 227; 61 T.C.M. (CCH) 2560; T.C.M. (RIA) 91203; May 13, 1991, Filed *227 Decision will entered under Rule 155. Jeannette A. Cyphers, for the petitioners. Dorinda J. Myers-Ohnstad and Terri A. Merriam, for the respondent. KORNER, Judge. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION By a timely sent notice of deficiency, respondent determined deficiencies in petitioners' 1985 and 1986 Federal income tax of $ 4,897 and $ 6,228, respectively. The issues for decision are: (1) Whether petitioners' yacht-chartering activity was an activity not engaged in for profit; (2) whether petitioners placed their yacht in service in 1985; and (3) whether petitioners are entitled to an investment tax credit relating to their yacht-chartering activity. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Paul J. (hereinafter Mr. Kahle) and Vanessa A. Kahle (Mrs. Kahle), husband and wife, resided in Seattle, Washington, at the time of filing their petition. Petitioners timely filed joint Federal income tax returns for calendar years 1985 and 1986. Petitioners' 1985 and 1986 combined income from wages was $ 48,554 and $ 48,259, *228 respectively. Since 1979, Mr. Kahle has worked full time for the Boeing Commercial Airplane Company, initially as a mechanic and more recently as a computer programmer and meteorologist. Mrs. Kahle was a registered nurse during the years at issue, working full time until petitioners' son was born in April 1986 and part time thereafter. Petitioners own two duplex houses. They live in one unit and maintain the other three as rental units. Petitioners reported losses with respect to these three rental units from 1985 through 1988. These losses were due largely to depreciation. Mr. Kahle grew up around boats. Most of the boats owned by his family have been older boats built in the 1930s. In 1967, Mr. Kahle's father purchased a 40-year-old 30-foot Bristol Bay sailboat. Although he held it primarily for personal use, his father also chartered it out at various times from 1968 through 1972. Mr. Kahle worked on his father's boat, helped maintain it, and assisted in the nonbusiness aspects of chartering it out and checking it back in after use. Mr. Kahle is a knowledgeable and experienced sailor. Petitioners owned for personal use a 30-foot Bristol Bay sailboat during the years *229 at issue called the " Gull." Petitioners used the Gull at least 47 days in 1985 and 1986. The United States Coast Guard classifies charters as being either bare-boat or skippered. A bare-boat charter is essentially any charter where the owner has no control over the use or destination of his boat. In this regard, the charterer either captains the boat himself or hires a third person not under the owner's control as captain. A skippered charter, on the other hand, is one where the charterer pays the owner to captain the boat. To do skippered charters, the owner must obtain a skipper's license, which requires documented experience and passing a written test. Petitioners decided to go into the chartering business sometime in the early 1980s. Mr. Kahle investigated the chartering business by reading brochures and interviewing charter agencies in the Seattle area. Most of these companies told him that they preferred boats up to 3 years old because such boats were easier for them to maintain. Based on his investigations and his own experience, Mr. Kahle planned to acquire an Ingrid 38, which is a "kit" (or unassembled) boat, and construct it himself. He chose the Ingrid *230 38 because of its heavy construction, which he felt could withstand the rigors of use by charterers better than a mass-produced boat. Sometime in 1984, petitioners started a small boat repair business called We Be Boats. Petitioners reported a $ 2,483 loss from this business for 1985, due primarily to the depreciation of their garage where the business was conducted. Petitioners planned to use We Be Boats to build the Ingrid 38. The Ingrid 38 is a ketch. The most popular type of sailboat for bare-boat charters in the Seattle area is a sloop, because it is easier to sail, with one mast, than a ketch, with two masts. While a very qualified and active sailor can sail a ketch "singlehanded," it usually takes two people to sail it. In September 1985, petitioners learned that an Ingrid 38 called the Tilsammen was for sale in Olympia, Washington. Petitioners inspected the boat and, despite its having been built in 1973, found it to be in very good condition with new mechanical parts and with only 125 hours' use on the engine. Petitioners then commissioned a marine survey, which also found only minor defects. The marine surveyor valued the Tilsammen at $ 62,000, with a new *231 or replacement value of $ 98,000. On November 16, 1985, petitioners purchased the Tilsammen for $ 55,000. Petitioners also insured the boat at this time, although they did not obtain charter insurance until they actually obtained their first charter in 1986. In mid-December 1985, petitioners moved the Tilsammen from Olympia to their mooring on Bainbridge Island, about one-half hour by ferry from Seattle. On December 16, 1985, petitioners entered into a nonexclusive charter agency agreement with Ledger Marine Charters. Petitioners also put up flyers at various locations around the city advertising the boat for Christmas charters. Christmas charters are usually skippered. No one sails on Christmas charters; people go out on the waterways around Seattle using engine power to look at the lights. Petitioners did not have a skipper's license and did not charter their boat in 1985. There were several problems with the Tilsammen that petitioners and the marine survey did not discover until after it was purchased. For example, while moving the boat from Olympia to Seattle, petitioners discovered that one of the halyards was inoperable. The boat was still capable of moving *232 by engine power but it could not be sailed until the halyard was fixed in January 1986. Other problems with the boat also required substantial maintenance, and took until the end of February 1986 to cure. Prior to purchasing the Tilsammen, petitioners did not prepare a written business plan or make a detailed schedule of income and expenses for a chartering business. Instead, they estimated their income and expenses. Petitioners entered into evidence a written business plan prepared by Mr. Kahle one month prior to trial. In it, Mr. Kahle attempted to reconstruct their 1985 estimated income and expense. The income and expense schedule of this plan is reasonable. We found Mr. Kahle to be a credible and forthright witness, and find, having given due weight to when it was prepared, that this plan represents petitioners' estimation of income and expense at the time they purchased the Tilsammen. Mr. Kahle planned to do his own maintenance on the Tilsammen, and felt that they could charter it for 20 years. He estimated they could gross about $ 6,000 per year through a combination of skippered and bare-boat charters. In their first few years of operation, Mr. Kahle planned *233 to obtain about one-half of their charters through their own advertising efforts and the other one-half through the efforts of a chartering company. He estimated their largest expenses to be moorage and interest on the note to purchase the boat. To save on moorage costs, he planned to moor their boat outside the immediate Seattle area. He also planned to accelerate their payments on the boat and pay it off by 1992 so as to not have an interest expense thereafter. Mr. Kahle estimated, without considering the principal payments on the boat, that petitioners would have a positive cash flow after their second year of operation. He also felt that the Tilsammen would retain its value, if not appreciate, while they held it. He knew that depreciation was available to help pay for their boat. Petitioners' long-range goal was to develop an operation that would underprice their competition but still allow them to earn as much as other boat owners who were exclusively represented by charter companies. Charter prices in the industry are usually set by the chartering agencies after including their commission. Petitioners planned to make the same amount for a charter whether arranged *234 by them or by a chartering company. In this respect, they planned to price their charters at the industry price less 25 percent (representing a charter agency's commission). They hoped to develop their own customer base through return customers and their own advertising, and then ultimately become semi-independent of the chartering companies. A boat like the Tilsammen can be chartered a maximum of 16 to 18 weeks a year in the Seattle area, considering seasonal weather conditions, although it can pick up odd day charters throughout the rest of the year as well. The high season for boat charters is July, August, and December, and there is a "shoulder" season in June and September. Mr. Kahle estimated they could get two to three one-day charters in 1985. He estimated six weeks of bare-boat charters and six days of skippered charters in 1986, and that the number of charters would slowly increase each year thereafter. Mr. Kahle planned to get a skipper's license sometime in 1986. He did not actually obtain the license until 1987 because of problems in verifying his time on a boat. From 1985 through 1988, petitioners reported the following income and expenses: 1985
1986
1987
1988
Charter Income
None  $ 2,013   $ 6,245   $ 4,422   Expenses:
[1]Depreciation   $ 7,838  12,849 10,973 10,973 Interest  527 4,834 3,698 2,724 [2]Other   1,166 5,496 7,367 3,760 Total  $ 9,531  $ 23,179  $ 22,038  $ 17,457  Profit or (Loss)
(9,531)
(21,166)
(15,793)
(13,035)
*235 Comparing their estimations with their actual income and expenses, petitioners underestimated some of their expenses. On the other hand, they also underestimated the amounts they were able to charge for charters. While petitioners projected a positive cash flow in year three, they actually showed a negative cash flow through 1988 (without regard to principal payments); in 1988, the activity was terminated. Petitioners did not maintain a separate checking account for their chartering activity. Rather, they kept a separate column in their check register for the activity. Respondent stipulated that petitioners' income and expense from the chartering activity have been substantiated. Of petitioners' 1986 charter gross income of $ 2,013, approximately $ 430 was earned from charters arranged by Ledger Marine. The remainder was earned *236 from petitioners' own efforts, including $ 375 earned by renting the boat as a houseboat during the winter months. With notice, petitioners could still perform maintenance and take the boat on skippered charters during this period. In 1987, petitioners changed charter companies to ABC Charters because they were unhappy with the number of charters Ledger Marine solicited in 1986. Of the $ 6,245 of income reported for 1987, at least $ 1,500 of this income was attributed to charters arranged by ABC. Of the remainder, $ 950 was earned by renting the boat as a houseboat during the winter months under a lease similar to the one for 1986. In 1988, petitioners changed charter companies back to Ledger Marine. Petitioners were unhappy with their agreement with ABC, and Ledger Marine had new owners. Petitioners' contract with ABC was an exclusive listing and ABC charged petitioners a 30-percent commission. Petitioners felt that their listing with ABC limited their chances of developing an operation based on return customers and charging lower charter fees. Most of the charters arranged by petitioners were to family, friends, and work associates. With three exceptions, they charged market *237 rate for their charters. These exceptions totaled less than one week of charters per year. Petitioners often took the boat out while performing maintenance on it. They also took the boat out to demonstrate it to potential customers, and took a 1-week trip in the 1986 shoulder season to investigate providing charters to the San Juan Islands. On May 14, 1988, Mrs. Kahle was in a serious automobile accident which confined her to bed rest until July 15, 1988, and prevented her from working until January 1989. Petitioners decided to terminate their charter activity in November 1988. Petitioners then put their boat up for sale. As of the date of trial, it had still not been sold even though the asking price had been reduced to $ 58,000. While it has been for sale, petitioners have chartered it out about twice a year. In his notice of deficiency, respondent determined that petitioners did not engage in their chartering activity with an objective of making a profit. He therefore limited petitioners' 1985 and 1986 chartering activity deductions under section 183, [3] and determined that petitioners were not eligible for a 1985 investment tax credit, and a 1986 carryover of that credit, *238 relating to their purchase of the Tilsammen. OPINION The first issue for decision is whether petitioners' yacht chartering operation was an activity not engaged in for profit within the meaning of section 183(a). If so, section 183(b)(1) allows only those deductions which are not dependent on a profit objective; and section 183(b)(2) allows all other deductions which would be allowable if the activity were engaged in for profit, but only to the extent that gross income from the activity exceeds the deductions allowable under section 183(b)(1). An "activity not engaged in for profit" is defined in section 183(c) as an activity other than one with respect to which deductions are allowable under section 162 or under paragraphs (1) or (2) of section 212. Section 162 allows a taxpayer to claim a deduction for all *239 ordinary and necessary expenses paid or incurred in carrying on a trade or business. Section 212 allows a taxpayer to deduct expenses incurred in connection with an activity engaged in for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. To deduct expenses under either section 162 or section 212, the taxpayer must show that he engaged in the activity with an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Beck v. Commissioner, 85 T.C. 557, 569 (1985); Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). In this context, profit means economic profit, independent of tax savings. Antonides v. Commissioner, 91 T.C. 686, 694 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Surloff v. Commissioner, 81 T.C. 210, 233 (1983). While the taxpayer's profit objective need not be reasonable, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued it, with *240 the objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Golanty v. Commissioner, supra at 425; Allen v. Commissioner, 72 T.C. 28, 33 (1979). Petitioners bear the burden of proving that they had the requisite profit objective. Rule 142(a); Beck v. Commissioner, supra at 569-570. In determining whether they have met their burden, we consider all relevant facts and circumstances, Golanty v. Commissioner, supra, and give greater weight to objective facts than to petitioners' mere statement of intent. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of nine objective factors for determining whether an activity is engaged in for profit. The parties have presented their arguments on brief by tracking the nine factors outlined in the regulations, and we adopt that format in this Opinion. No single factor, nor even the existence of a majority of the factors, is controlling. Golanty v. Commissioner, supra.
1. Manner in which the taxpayer carries on the activity. *241 Sec. 1.183-2(b)(1), Income Tax Regs.
Elements relevant to this factor include: whether petitioners maintained complete and accurate books and records; whether the activity was conducted in a manner substantially similar to other comparable businesses which are profitable; and whether changes were attempted in order to improve profitability. Sec. 1.183-2(b)(1), Income Tax Regs.; Engdahl v. Commissioner, supra.
Petitioners maintained complete and accurate records. While they maintained a single bank account for both their chartering activity and their personal use, their detailed records clearly show the income and expense attributable to the chartering operation. Respondent does not question petitioners' substantiation of income and expense. He argues, however, that petitioners did not have a profit objective in maintaining their books. His argument focuses on Mrs. Kahle's testimony that she kept detailed records not only to determine income and expense from the chartering activity, but also to keep track of how much they were spending for personal items such as food and gas. Thus, argues respondent, they were not attempting to keep proper records *242 for the yacht-chartering activity. We disagree. We fail to see how keeping detailed records of their personal income and expense detracts from the fact that they kept their chartering activity records to determine income and expense therefrom. Petitioners' activity was run in a manner that suggests a profit objective. Although they did not write up a detailed business plan, petitioners did contemplate the profitability of the activity before beginning it. Petitioners advertised their boat for charter by listing it with a chartering agency and through their own advertising efforts. Petitioners changed chartering agencies to ABC after 1986 because they felt Ledger Marine was not bringing in enough business. They changed agencies back to Ledger Marine (under new management) after 1987 because they felt their contract with ABC prevented them from developing their long-range goal for the operation. They leased their boat as a houseboat during the off-season. Respondent argues that petitioners did not have a sufficient advertising budget, either actual or projected, to enable them to independently solicit enough charters to operate at a profit. Respondent argues that since the *243 majority of charters arranged by petitioners were to family, friends, and work associates, they relied mainly on charter agencies for charters. Respondent then contends that due to the kind of yacht petitioners owned (a 12-year-old ketch), the agencies were unable to generate sufficient charters to make this activity viable. Petitioners estimated that chartering agencies would solicit about one-half of their charters during the first few years, and that they would develop the other one-half. The facts show that petitioners independently developed more than one-half of the charters. Chartering their boat to family, friends and work associates does not defeat the fact that petitioners did independently solicit and obtain charters. Additionally, with de minimis exceptions, there is no contention that petitioners did not charge market rate for these charters. On the other hand, the chartering agencies did not solicit the number of charters that petitioners estimated, giving some credence to respondent's argument. 2. The expertise of the taxpayers or their advisers. Sec. 1.183-2(b)(2), Income Tax Regs.
Mr. Kahle is a knowledgeable and experienced sailor. He questioned *244 various chartering agencies and read several brochures before deciding to purchase the Tilsammen. Respondent argues that petitioners had no experience in the chartering business, so that purchasing a 12-year-old ketch when the chartering companies preferred newer boats and advised that sloops were more popular, shows that petitioners did not have a profit objective. Chartering agencies preferred newer boats because they required less maintenance, which the agencies themselves normally performed. Mr. Kahle planned to do his own maintenance. Based on his experience with the boats his family had owned, Mr. Kahle believed that properly maintained older boats retained their value better than the newer mass-produced boats. He also believed that the strength of the boat, rather than its age, was of utmost importance. Finally, petitioners had planned to build a new Ingrid 38 until they found the Tilsammen. As for purchasing a ketch rather than a sloop, petitioners were not trying to appeal to the entire market. They planned to earn about one-half of their income through skippered charters, which are unaffected by the boat's type. The other one-half they hoped to get through *245 return customers capable of sailing their boat. While petitioners could have selected a more popular boat, they have persuaded us that they selected and purchased the Tilsammen for valid business reasons. See Rule 142(a). 3. The time and effort expended by the taxpayers in carrying on the activity. Sec. 1.183-2(b)(3), Income Tax Regs.
The fact that both petitioners worked full time outside of the chartering activity does not preclude a finding that petitioners were actively involved in the activity. McLarney v. Commissioner, T.C. Memo 1982-461. Petitioners performed most of the maintenance on the boat and were involved in all aspects of the chartering activity. It is also important to note that petitioners planned to provide skippered charters. While Mr. Kahle did not actually receive his skipper's license until 1987, he had submitted the paperwork to the Coast Guard several times earlier in an attempt to obtain it. 4. Expectation that assets used in activity may appreciate in value. Sec. 1.183-2(b)(4), Income Tax Regs.
Mr. Kahle testified that based on his experience, the Tilsammen would maintain its value, if not appreciate. *246 The brochure put out by Blue Water Boats, the manufacturer of the Ingrid 38 kits, implied this same result. On the record in this case, we can give this factor little weight here. 5. The success of the taxpayer in carrying on other similar or dissimilar activities. Sec. 1.183-2(b)(5), Income Tax Regs.
Petitioners' boat repair business showed a $ 2,483 loss in 1985. Their two rental properties also sustained losses from 1985 to 1988. Respondent argues that "Petitioners clearly have a history of failure with respect to both similar and dissimilar activities but no history of success." While respondent's allegation is an accurate statement of fact, we note that the majority of the losses were due to depreciation, and we give this factor little weight here. 6. The taxpayer's history of income or losses with respect to the activity. Sec. 1.183-2(b)(6), Income Tax Regs.
While petitioners sustained losses from 1985 to 1988, we recognize that an activity may expect a series of losses during its startup phase. Engdahl v. Commissioner, supra at 669. In accordance with their projections, petitioners' income from the chartering activity *247 steadily increased each year until 1988. Mrs. Kahle's accident occurred in May 1988 and she was bedridden until July 1988. Mr. Kahle had to care for Mrs. Kahle and their son and, as a result, had to curtail the amount of time he spent maintaining his boat and developing charters. In light of this unforseen accident, the 1988 decrease in income cannot be seen as an indication that the activity was not engaged in for profit. Cf. sec. 1.183-2(b)(6), Income Tax Regs.; Allen v. Commissioner, 72 T.C. 28, 35 (1979). Petitioners estimated a positive cash flow after the activity's second year of operation. The record shows that while they were too optimistic in some of their expense projections and the number of charters the charter agencies would provide, they hoped to show a positive cash flow after 1989 (without considering principal payments on the boat). Respondent challenges petitioners' projections first by arguing that petitioners did not consider depreciation when estimating cash flow. We agree that in determining profit or loss (rather than cash flow) for a year, losses due to depreciation must be considered. Blake v. Commissioner, T.C. Memo 1981-579, *248 affd. 697 F.2d 473 (2d Cir. 1982). Petitioners' projection of cash flow was therefore not analogous to profit or loss while the boat was being depreciated. Thus, petitioners' adjusted projections show a loss for the first 5 years since they were depreciating the boat on a 5-year schedule. Respondent next challenges petitioners' projections of gain for years after the boat was fully depreciated. Respondent argues that in projecting the profitability of an activity, petitioners should not consider they have made a profit until they have recovered their capital investment. Neither the code nor the regulations define the term "profit." However, the term profit has been defined as "taxable income," Lopkoff v. Commissioner, T.C. Memo 1982-701, and each year stands alone. Petitioners' adjusted projections show that they would have losses for their first 5 years and taxable income for the next 15 years. They estimated also, albeit optimistically, they would recover their capital investment through profits after the 10th year. Even if it took 20 years to recover their investment, [4] petitioners thought the boat would at least retain its value. *249 If it did not, it would still have residual value enabling petitioners to show an overall gain on the 20-year investment. 7. The amount of occasional profits, if any, which are earned. Sec. 1.183-2(b)(7), Income Tax Regs.
Petitioners earned no profit in their chartering activity. Additionally, since they have abandoned the activity they will never realize a profit. 8. The financial status of the taxpayers. Sec. 1.183-2(b)(8), Income Tax Regs.
During the years at issue, petitioners had sufficient *250 income from wages to enable them to utilize the tax benefits created by their chartering activity, although we do not think their income was so high as to make tax losses from boat chartering an incentive to engage in the venture. 9. Whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b)(9), Income Tax Regs.
Clearly, petitioners enjoyed sailing. They nonetheless argued that each time they took the Tilsammen out it was for business reasons. While we agree that the majority of the trips were business related, we believe that petitioners had purely personal use of the boat as well. However, based on the facts and circumstances, including the fact that they owned the Gull and used it at least 47 days during the years at issue, we find that their personal use of the Tilsammen was minimal. Petitioners have persuaded us that personal pleasure or recreation was not a factor in their decision to purchase the Tilsammen. Cf. Feldman v. Commissioner, T.C. Memo 1988-126. Although the issue is close, we hold that petitioners have met their burden of proving that their chartering activity was an activity engaged in *251 for profit. We leave for issue 2 the question of when the business began. The second issue for decision is whether petitioners placed their yacht in service in 1985. The line of demarcation between a business that is getting ready to operate and one that is already operating is usually indistinct. As the Fourth Circuit summarized: even though a taxpayer has made a firm decision to enter into business and over a considerable period of time spent money in preparation for entering that business, he still has not "engaged in carrying on any trade or business" within the intendment of section 162(a) until such time as the business has begun to function as a going concern and performed those activities for which it was organized. [Richmond Television Corp. v. United States, 345 F.2d 901, 907 (4th Cir. 1965), vacated and remanded on other issues 382 U.S. 68 (1965), vacated and remanded on other issues 382 U.S. 68 (1965), original holding on this issue reaffd. 354 F.2d 410, 411 (4th Cir. 1965), overruled on other grounds NCNB Corp. v. United States, 684 F.2d 285, 289 (4th Cir. 1982); fn. ref. *252 omitted.]
Respondent argues that the expenses which petitioners incurred in 1985 were startup costs because petitioners did not place the Tilsammen in service until 1986. We agree. While petitioners moved their boat to Seattle in mid-December 1985, entered a charter agency agreement, and advertised the availability of the boat for Christmas charters, we are not persuaded that they had yet reached the point of carrying on a trade or business. Even though petitioners' boat could have been powered with its engine, and thus could have been used for Christmas charters, it required substantial maintenance which took until the end of February 1986 to complete. We also note that Mr. Kahle was not yet licensed to provide the more popular skippered Christmas charters in 1985. Based on the facts and circumstances, we hold that petitioners went into business and placed their boat in service on March 1, 1986, and that expenses attributable to their chartering activity until that time were startup expenditures. The final issue for determination is whether petitioners are eligible for an investment tax credit for the years at issue. Section 38 provides a credit against tax for property *253 with respect to which depreciation is allowable and which has a useful life of 3 years or more. Sec. 48(a)(1). Our holding concerning whether the activity was engaged in with a profit objective is dispositive of this issue. Pike v. Commissioner, 78 T.C. 822, 841-842 (1982), affd. in an unpublished opinion 732 F.2d 164 (9th Cir. 1984). Since petitioners did not place the Tilsammen in service until 1986, they are not entitled to an investment tax credit for 1985. They are, however, entitled to an investment tax credit for 1986 since we found they placed their boat in service on March 1, 1986. Decision will be entered under Rule 155. Footnotes
1. Depreciation was based on a five-year useful life.↩
2. Expenses designated "other" include insurance, moorage, maintenance, improvements, advertising, and startup expenses.↩
3. All statutory references are to the Internal Revenue Code as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
4. Respondent alleged it would take 50 years for petitioners to make an overall profit but did not elaborate on this analysis. In a worst-case scenario we can see it taking, at most, one-half that time (without considering the time value of money). If respondent is arguing that petitioners must recover both their depreciation deductions and↩ their capital investment to make a profit, we specifically reject that argument because both depreciation and capital investment address the same outlay.