481 S.E.2d 159

Janet C. HENDLEY and William E. Hendley, Appellants,

v.

SOUTH CAROLINA STATE BUDGET AND CONTROL BOARD, acting By and Through its DIVISION OF INSURANCE SERVICES, Respondent.

No. 2606.

Court of Appeals of South Carolina.

Heard Dec. 3, 1996.

Decided Dec. 23, 1996.

Rehearing Denied Feb. 21, 1997.

James R. Honeycutt, Fort Mill; and James B. Richardson, Jr., Svalina, Richardson & Larson, Columbia, for Appellants.

Terry B. Millar, of McKinney, Givens & Millar, Rock Hill; and Craig K. Davis and James F. Flanagan, both of Davis Law Firm, Columbia, for Respondent.

ANDERSON, Judge:

This matter was heard by the master-in-equity pursuant to the Administrative Procedures Act (APA), S.C.Code Ann. §§ 1–23–310 to –400 (1986 & Supp.1995). The master ruled that a scalp hair prosthesis [1] prescribed for Appellant Janet C. Hendley (Mrs. Hendley) due to total hair loss caused by disease is not a covered medical expense under the group health insurance policy covering state employees and their dependents. We reverse.

### FACTS/PROCEDURAL BACKGROUND

The Division of Insurance Services (DIS) of the State Budget and Control Board administers the program of group health insurance (State Health Plan) provided for state employees and their dependents. By contract with the DIS, Blue Cross and Blue Shield (Blue Cross) processes claims for benefits under the State Health Plan.

Mrs. Hendley is insured under the State Health Plan because her husband, Appellant William E. Hendley, is a state employee. Mrs. Hendley suffers from the disease alopecia. "Alopecia" refers generally to the absence or loss of hair, most often on the scalp. Mrs. Hendley has the most severe form of

---

[1]. Is a "scalp hair prosthesis" a "wig"? With lucidity, Shakespeare penned an etymological exercise in Romeo & Juliet: "What's in a name? That which we call a rose by any other name would smell as sweet." Respondent insists on calling the device utilized by Mrs. Hendley a "wig." This may give some indicia of the mindset of Respondent in regard to coverage. We reject this nomenclature used by Respondent and adopt the more appropriate terminology "scalp hair prosthesis."

the disease, alopecia universalis, which results in the loss of *all* scalp and body hair, including the eyelashes and eyebrows. Alopecia may result from physiological changes as a part of the aging process, serious illness, drugs, endocrine disorders, certain forms of dermatitis, hereditary factors, or radiation. *See* Taber's Cyclopedic Medical Dictionary 73–74 (17th ed. 1989) (describing the forms of alopecia). The hair loss is often permanent and there is no known cure.

On May 16, 1994, Dr. Norris I. Boone, of Greenville, prescribed a scalp hair prosthesis for Mrs. Hendley's condition. The prosthesis, which costs $3,290.00, is custom fitted and secured with a so-called "vacuum" or suction cap for continuous wear. The Hendleys submitted a claim on May 23, 1994 for benefits under the State Health Plan for the prosthesis, as well as for procedures to apply permanent eyebrows and eye liner (tattooing).[2] The Hendleys asserted that the scalp hair prosthesis was medically necessary because it prevented damage to Mrs. Hendley's head due to sunburn and protected her from excessive loss of body heat in cold weather. They also maintained that the prosthesis, which should last from two to three years, is much more durable than an ordinary hairpiece. Finally, they noted that its customized fit would allow Mrs. Hendley to live a more normal existence because the prosthesis cannot fall off or be removed except by the individual using it.

Blue Cross denied the Hendleys' claim and also their request for reconsideration. The reviewing physician stated the scalp hair prosthesis was a cosmetic device and that it did not replace lost function. The physician opined that "the same functional benefit could be obtained with any soft covering of the head."

In accordance with Article 13 of the State Health Plan, the Hendleys sought review by the DIS of Blue Cross's denial of benefits. The Hendleys argued the scalp hair prosthesis was a durable medical good and that it was a covered expense under a provision in the State Health Plan allowing reimbursement for prostheses. As for the question of "medical necessity," the Hendleys noted the Plan covers breast

---

2. The Hendleys later dropped the request for tattooing.

prostheses even though they are not medically necessary to restore health.

The DIS affirmed the denial of benefits, stating the scalp hair prosthesis did not "identify or treat an illness or injury" and thus was not "medically necessary" as that term is defined in paragraph 2.49 of the State Health Plan. Further, the DIS noted "durable medical equipment" must primarily serve a "medical purpose," as required by paragraph 2.27 of the Plan, and paragraph 9.1FF excludes coverage for equipment which has a "non-therapeutic use." The DIS also noted that a booklet containing a general description of policy benefits (the Insurance Benefits Guide) contains a specific exclusion for "wigs." Finally, the DIS affirmed Blue Cross's determination that the prosthesis was cosmetic in nature and did not serve a medical purpose.

Having exhausted their administrative remedies, the Hendleys filed an appeal in the circuit court under the APA challenging the denial of benefits. The matter was heard by a master with finality. The master affirmed, stating the denial of benefits for the scalp hair prosthesis was supported by the record and was not "arbitrary and capricious." The master stated that since there is no cure for Mrs. Hendley's condition, the prosthesis could not "treat" the illness, and that any benefits obtained would not be medical or therapeutic. The Hendleys appeal.

### ISSUES

(1) What is the appropriate standard of review?

(2) Did the master err in finding a scalp hair prosthesis is not a covered expense under the terms of the State Health Plan?

### LAW/ANALYSIS

1. WHAT IS THE APPROPRIATE STANDARD OF REVIEW?

The APA states the following standard of review is to be used on appeal of an agency's decision:

The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand

the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(a) in violation of constitutional or statutory provisions;

(b) in excess of the statutory authority of the agency;

(c) made upon unlawful procedure;

(d) affected by other error of law;

(e) clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; or

(f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

S.C.Code Ann. § 1–23–380(A)(6) (Supp.1995).

■ The APA establishes the "substantial evidence" rule as the standard for judicial review of agency decisions. *Roper Hosp. v. Board of S.C. Dept. of Health & Envtl. Control*, 306 S.C. 138, 410 S.E.2d 558 (1991); *Lark v. Bi–Lo, Inc.*, 276 S.C. 130, 276 S.E.2d 304 (1981).

■ Substantial evidence is not a mere scintilla of evidence, but is evidence which, considering the record as a whole, would allow a reasonable mind to reach the conclusion that the administrative agency reached to justify its action. *Rogers v. Kunja Knitting Mills, Inc.*, 312 S.C. 377, 440 S.E.2d 401 (Ct.App.1994). *See also Ruocco v. South Carolina State Bd. of Registration for Prof'l Eng'rs & Land Surveyors*, 314 S.C. 111, 441 S.E.2d 829 (Ct.App.1994) (when reviewing an agency's decision under the APA to determine if substantial evidence exists, the record must be viewed as a whole to determine whether there is evidence that will allow reasonable minds to reach the conclusion of the agency). An abuse of discretion occurs when a factual ruling is without evidentiary support. *Fontaine v. Peitz*, 291 S.C. 536, 354 S.E.2d 565 (1987).

2. IS A SCALP HAIR PROSTHESIS A COVERED EXPENSE?

The pertinent provisions of the State Health Plan dealing with coverage are as follows:

2.19 *Covered Medical Expense* shall mean the Market Charge or per diem rate as determined by the Plan Administrator for each DRG [Diagnosis–Related Groups] category, or for those not included in a DRG category, a Reasonable and Customary expense, or where applicable under this Plan an Allowable Charge, for medical services and supplies Medically Necessary in the diagnosis or treatment of an illness or injury, and which is within the benefits provided in the Plan and not otherwise excluded by any term, condition, limitation or exclusion of this Plan.

2.27 *Durable Medical Equipment* shall mean any equipment which:

A. can withstand repeated use, and

B. is primarily and customarily used to serve a medical purpose, and

C. is generally not useful to a person in the absence of illness or injury, and

D. is appropriate for use in the home.

2.49 *Medical Necessity; Medically Necessary or Necessary Service and Supply* shall mean a service or supply:

A. that is required to identify or treat an illness or injury, and

B. prescribed or ordered by a Physician, and

C. performed in the least costly setting required by the Covered Person's condition, and

D. is consistent with the Covered Person's illness, injury, or condition, and in accordance with proper medical and surgical practices prevailing in the medical specialty or field of medicine at the time rendered, and

E. required for reasons other than the convenience of the patient. The fact that a service is prescribed by a Physician does not necessarily mean that such service is Medically Necessary.

2.66 *Prosthetic Appliance* shall mean any device which replaces all or part of a missing body organ or body member.

The Schedule of Benefits in Article 7 of the State Health Plan again defines Covered Medical Expenses, and specifically provides coverage for prosthetic appliances:

7.3H *Prosthetic Appliances necessary for the alleviation or correction of conditions caused by trauma or disease.* The Plan will provide benefits for the replacement of those prosthetic appliances that assist the body to function when the replacement is *medically necessary* and required by wear to the appliance [sic], or growth of the Covered Person, *provided, however, that charges for Prosthetic Appliances that have non-therapeutic uses are not a Covered Medical Expense,* and further provided that the Plan will provide benefits for the initial breast prosthesis, and a subsequent replacement thereof. (Emphasis added).

The State Health Plan contains exclusions in Article 9, one of which is for equipment having a non-therapeutic use:

9.1FF Equipment, including durable medical equipment, *which has a non-therapeutic use,* purchased or requested by the Subscriber with or without a prescription such as an air conditioner, air filter or air filtration system, dehumidifier, home whirlpool, exercise equipment, ace bandages, tennis shoe supports, knee braces, bandages and gauze and similar equipment, are not Covered Medical Expenses.[3] (Emphasis added).

■ After carefully reviewing all of the above policy provisions, we are persuaded the scalp hair prosthesis should be examined under the provisions of paragraphs 2.66 and 7.3H governing prostheses, rather than the provisions regarding "durable medical equipment." The Plan defines a "prosthetic appliance" in paragraph 2.66 as "any device which replaces all or part of a missing body organ or body member." *See also* Webster's Third New International Dictionary 1822 (1986) (defining "prosthesis" as "an artificial device to replace a missing part of the body (as a suction socket to replace a lower leg or a dental restoration)"); The American Heritage Dictionary 995 (2nd College Ed.1982) (defining "prosthesis" as "[t]he artificial replacement of a limb, tooth, or other part of the body").

We believe the definition of "prosthetic appliance" included in the State Health Plan is broad enough to encompass a scalp hair prosthesis which is used to replace a part of the body that

---

3. The Plan does, however, cover durable medical equipment when it is obtained for a therapeutic use (paragraph 7.3E).

has been lost from disease because in that context, it is no different than breast prostheses, prosthetic eyes, or artificial limbs. Concomitantly, we do not feel the scalp hair prosthesis can appropriately be described as "durable medical equipment" akin to whirlpools and air conditioners, as that term is defined in the Plan. *See Quinn v. State Farm Mut. Auto. Ins. Co.*, 238 S.C. 301, 120 S.E.2d 15 (1961) (where language used in an insurance contract is ambiguous, or where it is capable of two reasonable interpretations, that construction will be adopted which is most favorable to the insured; however, in the absence of ambiguity, the terms used are to be taken in their plain, ordinary, and popular sense).

This commonsensical approach is evident in *Zuckerman v. Empire Blue Cross & Blue Shield*, 155 Misc.2d 271, 598 N.Y.S.2d 665 (N.Y.App.Term.1993), in which an insured suffering from hair loss caused by alopecia areata sought coverage for a "prescribed replacement hairpiece" under a Blue Cross and Blue Shield health policy. The health policy provided coverage for "prosthetic and orthotic appliances which support or replace part or all of a body function or organ or replacement, repair, fitting and adjustment of such devices when prescribed by a practitioner." The court held that the terms of the policy allowing coverage for a "prosthetic appliance" which replaces a "body function" was sufficiently broad to include coverage for the replacement hairpiece prescribed by the insured's treating physician:

A hairpiece of the kind worn by plaintiff is readily encompassed within the policy term "prosthetic appliance", the word "prosthesis" being defined as "an artificial device to replace a missing part of the body." (Webster's Third New International Dictionary 1822 [1981] ). Indeed, that a hairpiece comes within the definitional term "prosthetic appliance" is confirmed by the defendant's own internal practice, undisputed on this record, of providing reimbursement on claims involving hairpieces necessitated by baldness resulting from chemotherapy or radiation treatments. Similarly, the average layperson reading defendant's policy might reasonably conclude that the growth or, more pertinently here, the complete loss of scalp hair was included within the ambit of the broad term "body function". There is at least an ambiguity in the policy provisions, which under well-

settled principles governing interpretation of insurance contracts, must be resolved in favor of the insured and against the insurer (see, *Lavanant v. General Acc. Ins. Co.,* 79 N.Y.2d 623, 629, 584 N.Y.S.2d 744, 595 N.E.2d 819; *Knudsen v. Field,* 185 A.D.2d 765, 586 N.Y.S.2d 950, 951). Nor has defendant come forward with evidentiary proof to rebut plaintiff's medical affidavits attesting to the bona fides and emotional sequelae of the medical condition—known as alopecia areata—which has necessitated plaintiff's use of a hairpiece.

*Id.* 598 N.Y.S.2d at 666.

We find the analysis in *Zuckerman* persuasive and distinguish it from a case relied on by the master, *Irion v. Prudential Ins. Co. of America,* 964 F.2d 463 (5th Cir.1992), in which the Fifth Circuit reversed the district court's holding that a scalp hair prosthesis was covered under a group medical policy provision allowing coverage for "artificial limbs, larynx, and eyes." The district court reasoned that hair was an "extremity" and therefore a "limb" which would come within the specified provision. After analyzing various definitions of "limb," the Fifth Circuit found the term "limb" included an arm or leg, but not hair. Since there was no other applicable provision to support recovery, the Fifth Circuit determined Ms. Irion could not prevail. In the case at bar, however, there is a provision in the State Health Plan that allows recovery for "prosthetic appliances"; thus, no strained analysis is necessary to reach our result.

■ Having found the scalp hair replacement prescribed for Mrs. Hendley is indeed a "prosthesis," the question then becomes whether the prosthesis is "medically necessary" and has a "therapeutic use" in accordance with paragraph 7.3H of the State Health Plan. The master ruled the prosthesis is not "medically necessary" because it does not affect or cure the underlying disease. We find this definition overly restrictive when considered in light of the Plan's application to other prostheses. For example, paragraph 7.3H generally provides coverage for prosthetic appliances that are "necessary for the *alleviation* ... of conditions caused by ... disease." (Emphasis added). Moreover, the Plan specifically covers breast implants and presumably even prosthetic eyes, but these items

do not replace lost function or cure the underlying condition which necessitates their use.[4]

In *Abernathy v. Prudential Ins. Co. of America,* 274 S.C. 388, 264 S.E.2d 836 (1980), the South Carolina Supreme Court defined "necessary" medical expenses as those that are "appropriate" for the insured's condition. In *Abernathy,* the insured sought coverage for depilatory treatments recommended by her physicians to remove excess facial hair caused by hirsutism. The insurance policy in question excluded coverage for "[a]nything not ordered by a doctor or not necessary for medical care of illness." The insurer argued the depilatory treatments were not covered expenses since they were not "necessary" for medical care, and asked the Court to construe the term "necessary" as meaning "essential." The Court rejected this proposal, stating:

> Exclusions in an insurance policy are always to be construed most strongly against the insurer. *Boggs v. Aetna Casualty and Surety Co.,* 272 S.C. 460, 252 S.E.2d 565 (1979).
>
> *The construction of the term "necessary" which most favors respondent is "appropriate." See, e.g., Southland Royalty Company v. U.S.,* [217 Ct.Cl. 431] 582 F.2d 604 (Ct.Cl.1978); Black's Law Dictionary 1181 (4th Ed.1968). In light of respondent's physicians' recommendation, there can be no doubt the depilatory treatments were appropriate for respondent's condition. We hold they were not excluded from coverage.

*Id.* at 391, 264 S.E.2d at 838 (emphasis added).

■ Black's Law Dictionary defines "necessary" as follows: This word must be considered in the connection in which it is used, as it is a word susceptible of various meanings. It may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought. It is an adjective expressing degrees, and may express mere

---

**4.** We believe there is a distinction to be made between an ordinary "wig" worn strictly for cosmetic purposes, which can be used by someone who is not suffering from a disease, and the scalp hair prosthesis prescribed for Mrs. Hendley for her alopecia; the latter is custom fitted with a suction cap and is appropriate only for someone who has suffered total hair loss. This is analogous to the distinction between "cosmetic surgery" undergone in the absence of accident or injury, and corrective or reconstructive surgery necessitated by injury.

convenience or that which is indispensable or an absolute physical necessity. It may mean something which in the accomplishment of a given object cannot be dispensed with, or it may mean something reasonably useful and proper, and of greater or lesser benefit or convenience, and its force and meaning must be determined with relation to the particular object sought.

Black's Law Dictionary 1029 (6th ed. 1990). *See also Kinzie v. Physician's Liab. Ins. Co.*, 750 P.2d 1140, 1142 (Okla.Ct.App. 1987) (reviewing the variety of definitions of "medically necessary" used in several jurisdictions, and noting that in *Abernathy v. Prudential Ins. Co. of America, supra*, South Carolina had "equat[ed] 'necessary' with appropriate"; the Oklahoma court, however, chose the more restrictive definition of "indispensable, essential, unavoidable, compulsory, or required").[5]

Finally, we note that several states have statutorily declared that a scalp hair prosthesis prescribed due to hair loss caused by alopecia is to be covered as any other prosthesis under health insurance plans. For example, Minnesota law provides: "Every policy, plan, certificate, or contract . . . [for accident and health insurance] issued or renewed after August 1, 1987, must provide coverage for scalp hair prostheses worn for hair loss suffered as a result of alopecia areata." Minn.Stat.Ann. § 62A.28 subd. 2 (1996).

---

**5.** "Therapeutic" is not defined in the State Health Plan. However, it too appears to have gradations of meaning, depending on the context. Webster's defines it as "of or relating to the treatment of disease or disorders by remedial agents or methods," or "curative." Webster's Third New International Dictionary 2372 (1986). It has also been defined as (1) pertaining to results obtained from treatment; (2) having medicinal or healing properties; or (3) a healing agent. Taber's Cyclopedic Medical Dictionary 1976 (17th ed. 1989). Although the master used the most narrow definition, *i.e.*, as something that cures, the interpretation most favorable to Mrs. Hendley is "relating to the treatment of disease." *See Myers v. Calvert Fire Ins. Co.*, 246 S.C. 46, 142 S.E.2d 704 (1965) (where words of policy are ambiguous or where they are capable of two reasonable interpretations, that construction will be adopted which is most favorable to insured).

Interestingly, the district court in *Irion* noted that Prudential informed Ms. Irion that it was denying her claim for a scalp hair prosthesis because it "offers only cosmetic and *therapeutic value.*" *Irion v. Prudential Ins. Co. of America*, 765 F.Supp. 337, 340 n. 6 (D.Tx.1991), *rev'd*, 964 F.2d 463 (5th Cir.1992).

New Hampshire law specifically provides that every insurer issuing policies of group or blanket accident or health insurance allowing coverage for other prostheses shall also provide coverage for scalp hair prostheses worn due to loss of hair caused by alopecia. Coverage is predicated on obtaining a written recommendation by the treating physician that the hair prosthesis is a medical necessity. N.H.Rev.Stat.Ann. § 415:18–d(I) (Supp.1995). Subsection II of the statute further provides that for purposes of this section:

(a) "Prosthesis" means artificial appliances used to replace lost natural structures. Prostheses include, but are not limited to, artificial arms, legs, breasts or glass eyes.

(b) "Scalp hair prostheses" means artificial substitutes for scalp hair that are made specifically for a specific individual.

N.H.Rev.Stat.Ann. § 415:18–d(II) (Supp.1995).

 We conclude the scalp hair prosthesis should be considered as any other prosthetic item under the terms and conditions of the State Health Plan. Although Respondent argues that an explanatory booklet issued to employees purports to exclude "equipment" such as "wigs" from coverage, we note that no such exclusion is found in the policy itself. Under paragraph 1.4 of the State Health Plan, the Plan document together with the individual enrollment applications "constitute the *entire* Plan of benefits established by the Planholder." (Emphasis added). Therefore, the explanatory booklet is not determinative of coverage.[6] *Cf. Dixon v. Western Union Assur. Co.*, 251 S.C. 511, 164 S.E.2d 214 (1968) (where insurance policy declared that the policy and the In Force Certificate shall constitute the entire contract of insurance between the parties, and there was a difference between the language of the policy and the Certificate, the beneficiaries under the

---

6. Page 28 of the Employee Benefits Guide lists "some medical expenses the Plan does not cover." One of these items reads: "Equipment that has a non-therapeutic use (such as humidifiers, air conditioners, whirlpools, wigs, vacuum cleaners, fitness supplies, etc.)." As noted above, we find the scalp hair prosthesis should be analyzed under the relevant provisions of the Plan governing prosthetic appliances, not under provisions regarding durable medical equipment such as whirlpools and vacuum cleaners.

policy were entitled to the benefit of that language which is most favorable to them).

## CONCLUSION

For the foregoing reasons, the decision of the master denying coverage is **REVERSED**.

CURETON and GOOLSBY, JJ., concur.